[No. 6738–6–III.   Division Three.   December 19, 1985.]

*In the Matter of the Adoption of*
J. D., ET AL.

CORINNA V. NEDELKOVITSCH, ET AL, *Respondents,* v.
JAMES L. HUFFMAN, *Appellant.*

MUNSON, J., dissents by separate opinion.

*Robert M. Boggs* and *Lyon, Beaulaurier, Weigand, Suko & Gustafson,* for appellant.

*Deborah A. Culpepper* and *Culpepper & Culpepper,* for respondents.

THOMPSON, J.—James L. Huffman appeals the termination of his parental rights, contending the trial court's findings (1) that he had abandoned his children pursuant to former RCW 26.32.056, and (2) that the best interests of the children would be served by the termination were not supported by substantial evidence. We reverse.

James L. Huffman and Corinna V. (Huffman) Nedelkovitsch were married on December 20, 1978, and at that time were living in Alaska. The Huffmans separated on February 2, 1981, while Mrs. Nedelkovitsch was pregnant with their second child. Shortly thereafter Mrs. Nedelkovitsch moved to Washington with their son and on August 28, 1981, the second child was born in Quincy.

Mr. Huffman continued to reside in Anchorage, and in November 1981, approximately 3 months after the birth of the younger child, he visited Mrs. Huffman and the two children. Although that was Mr. Huffman's sole period of visitation prior to the action for termination of his parental rights, occasional telephone calls were made and cards and gifts were sent on birthdays and holidays.

From the date of separation until approximately July 1982, the date Mrs. Huffman filed for dissolution, Mr. Huffman paid support ranging from $150 to $300 per month. In November 1982, Mr. Huffman lost his job. Pursuant to a March 1983 dissolution decree, Mrs. Huffman was awarded custody of the two children while Mr. Huff-

man was granted visitation rights and ordered to pay child support; but no support payments were made after July 1982.

Mrs. Huffman subsequently married Mr. Nedelkovitsch and in May 1984, the Nedelkovitschs petitioned the superior court for adoption of the children. Following Mr. Huffman's refusal to consent to the adoption, the Nedelkovitschs petitioned for termination of Mr. Huffman's parental rights. In an August 24, 1984 order, the trial court terminated Mr. Huffman's parental rights.

Mr. Huffman contends the trial court erred in determining he abandoned his children within the meaning of former RCW 26.32.056 (Laws of 1979, 1st Ex. Sess., ch. 165, § 13, p. 1566). He argues substantial evidence does not support the finding of abandonment and termination was not in the best interests of the children under the clear, cogent and convincing evidence standard. We agree.

We are mindful of the great value courts attach to parental rights.

> The fundamental nature of parental rights as a "liberty" protected by the due process clause of the Fourteenth Amendment was given expression in *Meyer v. Nebraska,* 262 U.S. 390, 399, 67 L. Ed. 1042, 43 S. Ct. 625, 29 A.L.R. 1446 (1923), wherein the court stated:
> . . .
> The courts of Washington have been no less zealous in their protection of familial relationships. Long ago, this court in *In re Hudson,* 13 Wn.2d 673, 678, 685, 126 P.2d 765 (1942), stated that a parent's interest in the custody and control of minor children was a "sacred" right and recognized at common law. The Court of Appeals has characterized the right of a parent to their child as "more precious to many people than the right of life itself." *In re Gibson,* 4 Wn. App. 372, 379, 483 P.2d 131 (1971).

*In re Akers,* 22 Wn. App. 749, 753, 592 P.2d 647 (1979) (quoting *In re Luscier,* 84 Wn.2d 135, 136–38, 524 P.2d 906 (1974)). We note that *In re Luscier* granted the parents the right to counsel in a deprivation matter because of the constitutional guaranty of due process under the fourteenth

amendment to the United States Constitution and article 1, section 3 of the Washington Constitution.

Thus, courts undertake a grave responsibility when they deprive a parent of the care, custody and control of their natural children, and parental rights should be terminated only for the most powerful of reasons. *In re Sego,* 82 Wn.2d 736, 738, 513 P.2d 831, 832 (1973); *In re Day,* 189 Wash. 368, 65 P.2d 1049 (1937). Clear, cogent and convincing evidence is necessary to sustain the critical order terminating parental rights. *In re Pawling,* 101 Wn.2d 392, 399, 679 P.2d 916 (1984). Appellate review is limited to the determination of whether there is substantial evidence to support the trial court's findings in light of the "clear, cogent and convincing" standard. *In re Sego,* at 739.

In determining whether parental rights should be terminated prior to step–adoption, the Supreme Court has held:

> the appropriate procedure in proceedings under RCW 26.32 is to consider two questions: (1) jurisdictional—whether the biological parent, by behavior, has forfeited all rights in the child, *i.e.,* whether the child has been deserted or abandoned under RCW 26.32.056; and (2) dispositional—whether terminating parental rights would be in the best interests of the child.

*In re Pawling,* at 400.

With respect to abandonment, former RCW 26.32.056 provided:

> In the case of a petition filed by a parent and joined by the petitioner's spouse seeking termination with respect to the other parent, and such other parent appears and contests the termination, *the court shall determine whether such parent has deserted or abandoned the child under circumstances showing a wilful substantial lack of regard for parental obligations.* If the court makes such a finding, it shall terminate his rights to the child.

(Italics ours.) *In re Pawling,* at 396; *In re Lybbert,* 75 Wn.2d 671, 674, 453 P.2d 650 (1969). Abandonment means the voluntary failure or neglect to care for as well as failure to support. *In re Miller,* 86 Wn.2d 712, 717, 548 P.2d 542

(1976).

■ Under former RCW 26.32.056, inquiry must be made into whether the parent has met his or her minimum parental obligations. *In re Pawling,* at 398; *In re Lybbert,* at 674. These obligations include the following:

> (1) express love and affection for the child; (2) express personal concern over the health, education and general well–being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.

*In re Pawling,* at 398 (quoting *Lybbert,* at 674).

Mr. Huffman testified to significant personal and job–related problems immediately following the 1982 petition for dissolution which made long–distance travel to Washington prohibitive and ultimately resulted in his loss of employment and ability to pay support. Although total failure to support is not condoned, neither can we say, based on Mr. Huffman's circumstances, he *voluntarily* failed to care for or support his children or was guilty of a *willful,* substantial lack of regard for parental obligations.

The facts in this case are far less supportive of a finding of abandonment than in *In re Pawling* and *In re Lybbert,* the two cases principally relied on. In *Lybbert,* the father had failed to support or fulfill parental responsibilities for 9 years. His whereabouts were totally unknown to his ex–wife for 4 of those years. In *Pawling,* the time period considered by the court was 4 years from the 1975 divorce until time of hearing. But the natural father had been incarcerated in the state penitentiary for the last 2 of those 4 years and had a minimum term release date in 1985. Here, at a time when the psychological and economic impact of the dissolution was most significantly felt, the passing of only 2½ years does not constitute sufficient time within which to adequately evaluate the requisite criteria necessary to find abandonment. These children are so young and far away from their father, compliance with the *Pawling* requisites is extremely difficult. It is obvious the requisite communica-

tions and external evidence of love and caring of necessity would have to be made almost exclusively through the custodial parent. Distance alone, the miles between Alaska and Washington State, is a barrier to visitation, particularly to the unemployed.

Termination is such a final and unforgiving result that even in those instances where a parent is abusive or grossly neglectful, the State is obligated to provide counseling and services to remedy parental deficiencies before rights can be terminated. RCW 13.34.130, .180. Here, Mr. Huffman's first notice of the possible dire consequences of his derelictions was after the commencement of this proceeding, leaving no time to demonstrate a resolve to undertake his parental responsibility. Termination in so short a time in light of all the facts is not warranted. Simply put, the clear, cogent and convincing standard of proof was not satisfied.

Since we have resolved the jurisdictional question in the negative, we do not reach the determination of the best interests of the children, but note our holding is consistent with testimony to the effect Mr. Huffman's contact with the children would not significantly undermine the important bond between the children and their stepfather. The benefit to be derived by finding abandonment and allowing the adoption appears minimal compared to the potential emotional and mental impact the termination could have on the children and their natural father. Those most powerful of reasons for termination alluded to in *Sego* have not been shown to exist in this case.

Reversed.

McINTURFF, A.C.J., concurs.

MUNSON, J. (dissenting)—There are two requirements for a stepfather adoption, namely, "(1) jurisdictional—whether the biological parent, by behavior, has forfeited all rights in the child, *i.e.,* whether the child has been deserted or abandoned under RCW 26.32.056; and (2) dispositional— whether terminating parental rights would be in the best

interests of the child." *In re Pawling,* 101 Wn.2d 392, 400, 679 P.2d 916 (1984).

The majority's major premise is that the 2½–year interval between the time the father last saw the children and the termination proceeding is insufficient to justify a finding of abandonment. Mr. Huffman's contention was that about the time of the divorce, he lost his job because of the psychological impact thereof. However, his failure to financially support his children lasted for nearly 2 years. During that time, he held several other jobs, received an Alaskan allotment of $1,000, and received over $2,000 from Alaska Natural Gas after being fired.

Further, I agree with the trial court's characterization that Mr. Huffman's conduct toward the children displayed his "total lack of regard for the parental [*sic*] obligations." *In re Lybbert,* 75 Wn.2d 671, 674, 453 P.2d 650 (1969). While he occasionally sent the children a card or gift, I question whether such nominal contact fulfills the "express love" criterion set out in *Lybbert.* Obviously, Mr. Huffman has been unable to provide religious and social guidance to his children; he has seen them only once since 1981. Mrs. Nedelkovitsch testified he: (1) never inquired about his children's health; (2) never inquired as to whether she needed assistance in raising the children; and (3) never provided food, clothing, or medical care for the children even when Mrs. Nedelkovitsch was on public assistance.

Mr. Huffman's testimony and its credibility was to be determined by the trial court. One of the most poignant statements by the father was he did not desire termination because he did not contemplate remarriage and thus these children would be the last to bear the family name. Cheryl Raber, a court appointed guardian ad litem, testified, that with respect to the children, Mr. Huffman wanted "the name, but not the game". She stated Mr. Huffman was now a stranger to his children and the Nedelkovitschs were the children's "psychological" parents. Ms. Raber further testified the best interest of the children would be served by the termination.

Given that the father has paid little, if any, attention to these children in the 2½ years prior to the termination proceeding (there being no record of his interest and concern since that time), I agree with the statement in *In re Pawling,* at 401:

On appeal, we are constrained to place *"very strong* reliance on trial court determinations of what course of action will be in the best interests of the child." *In re Todd,* 68 Wn.2d 587, 591, 414 P.2d 605 (1966). We are not allowed to second guess the trial court—"to weigh either the evidence or the credibility of witnesses even though we may disagree . . ." *In re Sego,* [82 Wn.2d 736, 513 P.2d 831 (1973),] at 739–40.

My reading of the record reflects that the trial court was well aware of the statutory requirements. Parental termination is one of the most difficult tasks facing any trial judge. This case was tried before an able and competent judge who had been on the bench for over a decade at the time of this hearing. He had the opportunity to see and hear these witnesses. I would apply *Pawling* and affirm.