■ In the Matter of REALITY RASHIDA J., a Child Alleged to be Abandoned. LEAKE & WATTS CHILDREN'S HOME, INC., Respondent; BARBARA ELAINE J., Appellant. [616 NYS2d 181] — Order of the Family Court (Bruce Kaplan, J.), entered May 1, 1992, finding that the mother and putative father abandoned the child and ordering the custody and guardianship rights of the parents terminated and transferred to the Commissioner of Social Services of the City of New York and Leake & Watts Children's Home, Inc., and authorizing and empowering said Commissioner and Leake & Watts to consent to adoption without notice and consent of the parents, is reversed on the

law and facts, to the extent appealed from, and the matter is remanded for further proceedings as to the child's best interests, without costs or disbursements.

Reality Rashida J. was born August 11, 1989, with positive toxicology for cocaine. She was placed in foster care through the agency 10 days later and has remained in the same preadoptive home ever since.

During the six-month period prior to the filing of the petition to sever parental rights, from September 20, 1990 to March 20, 1991, neither the mother nor putative father had any contact with the child. The father never appeared at any of the proceedings and did not appeal from the Family Court's determination.

At hearings on the abandonment and disposition issues, the **testimony established that the mother had four other children; one is an adult and three others were in the care of** Leake & Watts, the two older ones (teenagers) in a group home and the younger one (four years old) in another foster home. The testimony further established that after Reality was placed in foster care, the mother visited her several times before she was arrested in California in August 1990, and incarcerated for in excess of one year on drug charges, gaining release in September 1991. During that time, the mother testified that she was in contact with the agency with regard to her other children and sought information concerning Reality from the other children; she was only allowed one telephone call per day and whenever she attempted to telephone Reality's caseworker, whose name she knew, she was unable to reach him. She did have contact with another child, and with Leake & Watts on his behalf. She did not have any money during her incarceration to send gifts, nor did she write to Reality, who was only one year old at the time.

Upon her release from custody in September 1991, the mother returned to New York and sought visitation. Her first visit with Reality was in October 1991, and she had visited with her on a number of occasions after that time. Reality also had sibling visits and knew and was friendly with her brothers. She was described as a friendly child with a positive relationship with her mother as well as her foster mother.

The mother was in a drug program and had most recently tested negative for drugs; she was not employed and did not have housing.

The foster mother who had had custody of Reality from the time she was 10 days old wished to adopt her. She was a

single parent who resided with her teenage son and another young (two-year-old) foster child who would not be adopted. She was not employed, had a support system to help her if necessary, was aware of a speech problem Reality has and was involved in a plan to deal with her special needs.

The court did not allow evidence from the other children's case files concerning the mother's contact during the time she was incarcerated.

The Family Court found that neither the mother nor father had made an effort to visit with the child during the six-month period preceding the filing of the petition and that the mother's testimony to the contrary was not credible, given her ability to contact the other child when she wished and the possibility for her to write to the agency concerning Reality even if she was unable to reach it by telephone. The court determined the parents to have abandoned the child, and, while giving the mother credit for currently dealing with her substance abuse, found that it was in the best interests of Reality to order the termination of the parental rights, to transfer the rights to the New York City Commissioner of Social Services and Leake & Watts and to authorize the Commissioner and Leake & Watts to consent to adoption of the child.

**Social Services Law § 384-b (4) (b) authorizes termination of parental rights when a parent abandons a child for a period six months immediately prior to the date the petition is filed. A child is deemed abandoned for the purposes of this section if the following criteria are met:**

"a child is 'abandoned' by his parent if such parent evinces an intent to forego his or her parental rights and obligations as manifested by his or her failure to visit the child and communicate with the child or agency, although able to do so and not prevented or discouraged from doing so by the agency. In the absence of evidence to the contrary, such ability to visit and communicate shall be presumed.

"(b) The subjective intent of the parent, whether expressed or otherwise, unsupported by evidence of the foregoing parental acts manifesting such intent, shall not preclude a determination that such parent has abandoned his or her child" (Social Services Law § 384-b [5] [a], [b]).

With respect to the mother's acts "manifesting such intent" to "forego * * * her parental rights", she had three other children in foster care and knew how to maintain contact and get information about them through channels and could have

done the same for Reality. On the other hand, it does not make much sense to write or send cards to a one-year-old when one knows that one will be able physically to visit before the child is old enough to appreciate the correspondence. In addition, if her testimony is credited, the mother did make inquiries of her other children who visited with Reality and who might have been more responsive to her inquiries than the agency. Further, since all the children were placed with the same agency, it would not be unreasonable for a layperson to conclude that contact with the agency with respect to one child and asking about the others, even if each had a different caseworker or counselor, might constitute adequate inquiry.

While not required to use "diligent efforts" to encourage the mother to maintain her connection to Reality while she was incarcerated (see, Social Services Law § 384-b [5] [b]), there is an issue whether the mother was "discouraged" from doing so by the agency (§ 384-b [5] [a]), which appeared to make *no* efforts at all to assist in communications with Reality. She had visited with Reality during the 11 months from birth up to less than a week before her arrest, and the agency was aware of her incarceration, serving the petition papers on her in the California prison. The agency commenced the proceeding barely seven months after the mother's incarceration, the requisite six-month period commencing only about six weeks after the mother's arrest.

There is no doubt that, by the letter of the statute and without reference to any collateral evidence, the mother failed to communicate with Reality for the six-month period immediately preceding the commencement of the guardianship and custody proceedings.

The Family Court, however, did not allow any development of evidence with regard to crossover inquiry by the mother or her adult daughter with respect to Reality. It limited questioning of the caseworker strictly to Reality's file, when it appeared that there might have been information in the files of the other children relevant to the overall interest shown by the mother.

The mother testified about contact she had with the agency, albeit with respect to making regular calls to another child, and about the difficulties in making telephone calls from the prison, a major consideration if the agency is requiring her to make one to each of four children on a regular basis. While incarceration does not relieve the parent from her duty to maintain contact with a child (*Matter of I. R.,* 153 AD2d 559,

561), the particular circumstances, faced by the respondent herein who *was* maintaining contact with the other children, should be taken into account.

Here, the mother was not directly communicating with the one child for a relatively short period of time (but concededly within the dictate of the statute) before the agency took action. This proceeding was brought even though she had contacted the agency with regard to the older children shortly after her incarceration to set up regular phone calls. Reality's caseworker called the prison more than once, beginning January 31, 1991, although he did not speak directly to the mother, yet made no attempt to ascertain her intentions before the commencement of this proceeding in March 1991. While, as noted, it is not necessary for the agency to make diligent efforts to see that the parent maintains her relationship with the child *(see,* Social Services Law § 384-b [5] [b]; *Matter of Anonymous,* 40 NY2d 96, 99), under the circumstances of this case, upon the record before the Family Court, the agency was premature in its action.

Taking a child away from a parent is a serious business. In this case, we are not entirely convinced that the record showed that the best interests of the child would be served by termination of the mother's parental status. For that reason, we are remanding for a more considered evaluation by the Family Court using the standards and guidelines set forth above.

The further proceedings upon the remand can also explore how well the mother has comported herself in the interval since the Family Court's order was entered, whether she has remained sober, whether she has continued counseling, has housing and is employed or has other support, whether she can take care of any or all of the children emotionally or can see to any special needs of Reality which may remain. After a *de novo* hearing on these factors, as well as those originally explored, the Family Court can then make a determination and disposition as to the best interests of the child. Concur— Murphy, P. J., Wallach and Asch, JJ.

Kupferman, J., dissents in a memorandum as follows: I would affirm for the reasons stated by the Family Court.

I might add that the reasons stated by the majority substantiate that conclusion. The Law Guardian also asks that the determination be affirmed. Clearly, the best interests of the child require this conclusion *(see, Matter of Star Leslie W.,* 63 NY2d 136, 148).

The Family Court was in the best position to judge and make the credibility finding and it found, after some soul searching, that the credible evidence showed that the respondent-appellant did not take the necessary steps in the six-month period preceding the filing of the petition *(see, Matter of Irene O.,* 38 NY2d 776; *see also, Nightingale Rest. Corp. v Shak Food Corp.,* 155 AD2d 297).

Motion for clarification granted, and, upon clarification, the decision and order of this Court entered on December 7, 1993 (199 AD2d 22) is recalled and vacated and a new decision and order substituted therefor.