[No. 43453-5-I.   Division One.   August 23, 1999.]

*In the Matter of the Interest of* INFANT CHILD SKINNER, NEW HOPE CHILD & FAMILY AGENCY, *Respondent,* and CONRAD WILLIAMS, *Appellant.*

[22]RCW 2.06.040.

110

*Sharon Jean Blackford*, for appellant.

*David Victor Andersen* of *Brown & Andersen*, for respondent.

*Clifton Charles Johnson*, for Infant Skinner.

COLEMAN, J. — This appeal arises out of an adoption proceeding. Conrad Williams's parental rights were terminated under RCW 26.33 after the child's mother placed the child for adoption. Williams appeals the termination order, arguing that the procedures for termination under RCW 26.33 and the standards set by the act violate his constitutional rights to due process and equal protection. We hold that the standard for termination and the procedures set forth within the adoption act satisfy the requirements of due process and equal protection and that Williams is not entitled to receive services prior to termination as a matter of constitutional right. We also reject Williams's argument that his situation is similar to that of a parent in a dependency proceeding, entitling him to similar treatment.

Williams also contends that the trial court erred in finding that he had showed substantial disregard for his obliga-

tions as a parent and in terminating his parental rights. We conclude, however, that substantial evidence supports the trial court's findings, and we affirm.

## FACTS

On April 21, 1998, Sarah Skinner relinquished the child she was expecting to the New Hope Child & Family Agency for adoption. She gave birth five days later. Conrad Williams is the child's father.

In July 1998, a hearing on the termination petition was held. The evidence presented by the parties at the hearing differed considerably. The previous summer, Williams had lived with Skinner and her 6-month-old daughter off and on until he was arrested in August 1997. At that time, Williams was 25 years old and Skinner was 19. Skinner testified that Williams sold crack cocaine every day while he was living with her and that he would "cook" it in their apartment. When asked about this testimony, Williams denied selling cocaine on a frequent basis but admitted that he had smoked marijuana daily. Williams testified that he used to smoke marijuana four or five times a day and was usually high for five or six hours at a time. At that time, Williams's sister and her two children were also living in the apartment. Skinner testified that Williams once smoked marijuana in her bathroom with children in the room to help them fall asleep.

In August 1997, Williams was arrested for possession of cocaine and was incarcerated. Shortly after Williams was incarcerated, Skinner told him that she was pregnant but that she believed she was unable to care for a second child and could not keep the baby. Four months later, in January 1998, one of Skinner's friends told Williams that Skinner was thinking about giving the baby up for adoption. Skinner testified that she received no support from Williams or his family during her pregnancy. Although Williams had given her his parents' telephone number, she testified that she did not contact them because she did not know them.

She also claimed that although Williams had initially opposed the adoption, he later sent her a letter that indicated his consent to an adoptive placement.[1]

Skinner contacted New Hope in March 1998 to pursue an adoptive placement for the child. She testified that she relinquished her child for adoption because otherwise she would have had to raise the child by herself, which she could not afford to do. Williams, however, opposed the adoption and refused to sign New Hope's consent forms. He told a New Hope caseworker that he did not want to relinquish his parental rights. After Williams refused to consent to the adoption, Skinner cut off all contact with him and did not notify him when the baby was born or tell him the baby's whereabouts. New Hope placed the child in a receiving care home and then into the custody of the child's preadoptive parents.

At the termination hearing, Williams testified that he wanted to raise his son. He had called New Hope to find out when the child had been born and testified that he and his relatives had tried to contact Skinner to see the child but that she would not tell them the child's whereabouts. Williams is still incarcerated and has no history of sustained employment. His criminal history includes six juvenile convictions from 1988 to 1990 and eight adult convictions for offenses he committed between 1990 and 1997. His last three convictions in 1997 and 1998 were for delivery and possession of cocaine. The parties stipulated that Williams's early release date is January 2, 2000, and that he has not forfeited any good time credit on the current charge.

Williams testified that before the child was born, he told Skinner that he would help her when he could and that his friend, Sharonda Thomas, would also provide support. When questioned on his ability to provide for the child, he testified that he had worked in the past performing odd

---

[1]At the hearing, counsel for New Hope asked Skinner if Williams had written her a letter stating that she "should do whatever the fuck [she] wanted," and Skinner said he had. She testified that she thought the statement was "a go ahead on the adoption" and that she was "just really happy that he said that" because she had been planning to have an abortion.

jobs for his father and that he had offers of employment waiting for him upon his release. While incarcerated, Williams had been enrolled in classes for two months until he obtained work in the facility's kitchen. On July 6, he was fired from his kitchen position after a disagreement with a guard, but he testified that he was scheduled to return to work the following month. In addition, Williams indicated that although his father did not want custody of the child, his father was willing to provide financial support.[2] Williams testified that he was close to his father and that they spoke two or three times each week.

A court-appointed guardian ad litem (GAL) also testified at the hearing. Contrary to Williams's assertions, the GAL found that Williams had not made any effort to support Skinner and the child, either financially or emotionally. Williams told the GAL that he did not talk to his parents anymore and had no contact with his family. He provided the GAL with the telephone number of a relative, but the number had been disconnected. When asked about his plans to provide for the child in the future, Williams told the GAL that he was a writer and was expecting a payment from a publisher. The GAL concluded that Williams had no concrete plans to provide for the care and custody of the child and recommended that the child be placed for adoption. The GAL emphasized that Skinner felt that the adoption was in the child's best interests since she "didn't have the wherewithal or support to take care of that child the way she thought it should be taken care of[.]"

The trial court granted the petition to terminate Williams's parental rights. Williams appealed.

## DISCUSSION

### Due Process

■■ Williams first argues that the termination of his

---

[2]Williams testified: "My dad is . . . just getting back [to work] because he's been out of work four years because of his accident, and him and my stepmom [are] really involved in their career right now and he's not willing to raise the baby [because] the baby needs attention 24 hours a day because he's so young. Now but he did say that yes, I will give you all the financial support you need."

parental rights violated his right to due process of law.[3] Because all legislative enactments are presumed to be constitutional, the burden of establishing a statute's unconstitutionality rests upon the party challenging the statute. *In re Dependency of K.R.*, 128 Wn.2d 129, 142, 904 P.2d 1132 (1995); *In re Dependency of C.B.*, 79 Wn. App. 686, 689, 904 P.2d 1171 (1995).

■ ■ Our courts have recognized that natural parents possess fundamental liberty and privacy interests in the care, custody, and management of their children and that these interests are protected by the Fourteenth Amendment entitlement to due process. *See In re Dependency of J.H.*, 117 Wn.2d 460, 473-74, 815 P.2d 1380 (1991); *see also Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). In addition to notice and an opportunity to be heard, due process requires that the factual basis for termination be shown by at least clear and convincing evidence. *Santosky*, 455 U.S. at 769-70. Under our adoption statutes, the parent-child relationship may be terminated

> upon a showing by clear, cogent, and convincing evidence that it is in the best interest of the child to terminate the relationship and that the parent has failed to perform parental duties under circumstances showing a substantial lack of regard for his or her parental obligations and is withholding consent to adoption contrary to the best interest of the child.

RCW 26.33.120. The inquiry focuses on whether the biological parent, by his or her behavior, has forfeited all rights in the child and whether terminating parental rights would be in the child's best interests. *See In re H.J.P.*, 114 Wn.2d 522, 531, 789 P.2d 96 (1990). Our Supreme Court has held

---

[3]Williams assigned error to the parental rights termination under both the Fourteenth Amendment and article I, section 3 of the Washington Constitution, but did not present any argument regarding why the state constitution provides greater due process protection than the United States Constitution in this context. Without the benefit of argument or citation to authority on the state constitutional claim, we will limit our analysis to the federal constitutional issue. *See State v. Carver*, 113 Wn.2d 591, 598-99, 781 P.2d 1308, 789 P.2d 306 (1989).

that the requirement of proof by clear, cogent, and convincing evidence and the statute's focus on parental unfitness satisfy the constitutional standard set forth in *Santosky*, rejecting procedural and substantive attacks on the standard for termination under the act. *See In re Adoption of McGee*, 86 Wn. App. 471, 477-78, 937 P.2d 622 (1997) (discussing *H.J.P.*, 114 Wn.2d at 529-31).

Williams argues, however, that the standard for termination under the act is inadequate because there is no requirement for the State to provide remedial services to a parent before a termination petition is filed. In a dependency proceeding, the State generally attempts to reunify the child at issue with his or her natural parents and provides the parents with opportunities to remedy parental deficits, including visitation with an incarcerated parent, parenting classes, and other remedial services. RCW 13.34-.020; RCW 13.34.030(9); RCW 13.34.130(1), (4)(b), (7). Parental rights regarding a dependent child may be terminated before any remedial services have been provided if the court determines, at a hearing, that certain aggravating circumstances are present or that services would be futile. RCW 13.34.130(2); RCW 13.34.180(7)-(8); RCW 13.34.190. Williams contends that in an adoption proceeding, remedial services should also generally be required, citing several cases for support. But contrary to Williams's assertions, these cases do not recognize an entitlement to remedial services as a matter of constitutional right. Rather, the cases refer to the procedures governing termination in the former adoption code, which provided for such actions to proceed under the dependency statutes. *See, e.g., In re Adoption of J.D.*, 42 Wn. App. 345, 350, 711 P.2d 368 (1985); *In re Adoption of Baby Boy C.*, 31 Wn. App. 639, 644 P.2d 150 (1982); *Halsted v. Sallee*, 31 Wn. App. 193, 639 P.2d 877 (1982).

■ ■ Williams cites to no additional authority in support of his argument. We note that courts in other jurisdictions have rejected similar arguments, finding that remedial services are not required prior to a parental rights

termination under a due process analysis. *See In re Baby Boy H.*, 63 Cal. App. 4th 470, 475, 73 Cal. Rptr. 2d 793 (1998) (finding no constitutional entitlement to reunification services); *accord In re A.C.*, 597 A.2d 920, 923-24 (D.C. 1991); *In re Daniel C.*, 480 A.2d 766, 771 (Me. 1984); *see also In the Interest of N.R.*, 967 P.2d 951, 955-56 (Utah Ct. App. 1998) ("Reunification services are a gratuity provided to parents by the Legislature, and appellants thus have no constitutional right to receive these services."). We also conclude that remedial services are not constitutionally required prior to a parental rights termination in this context. We have repeatedly rejected the argument that the primary focus in such proceedings should be the interests of the parent, holding that the rights of the parent must yield, when necessary, to the best interests of the child. *See, e.g., In re Dependency of J.W.*, 90 Wn. App. 417, 427, 953 P.2d. 104 (citing *In re Adoption of Lybbert*, 75 Wn.2d 671, 674, 453 P.2d 650 (1969)), *review denied*, 136 Wn.2d 1021 (1998); *In re Pawling*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984). The child's interests require continuity of care and a timely integration into a permanent home. RCW 26.33.010; *In re Adoption of Baby Girl Jackson*, 89 Wn.2d 945, 949-50, 578 P.2d 33 (1978). Thus, we conclude that remedial services are not required in an adoption proceeding and that termination may occur when it is shown by clear, cogent, and convincing evidence that the nonconsenting parent is unfit and is withholding consent contrary to the child's best interests. We recognize the fundamental liberty and privacy interests of natural parents in the care and custody of their children, but conclude that the constitution does not require services to preserve these interests in this context.

Equal Protection

■ Williams next contends that the application of the statute violates his right to equal protection under the federal and state constitutions. Our courts have consistently construed the federal and state equal protection clauses as identical and have considered equal protection

claims under both clauses as one issue. *State v. Manussier*, 129 Wn.2d 652, 672, 921 P.2d 473 (1996).

Williams contends that he suffers from a greater risk of erroneous termination than a parent in a dependency proceeding because the adoption statutes provide less due process protection. As discussed above, we reject the argument that the provision for termination in the adoption statutes does not adequately protect a parent's due process rights. Termination may proceed only after a court has found by clear, cogent, and convincing evidence that a parent is unfit, and this standard is consistent with the constitutional requirement. Williams argues, however, that the act makes no provision for remedial services or the maintenance of family ties and does not provide for relative guardianship petitions or mandate consideration of extended family placements. He contends that he is entitled to have such dispositions considered because they are available in the dependency context and because these alternatives can help preserve the parent-child relationship. Williams further argues that because his fundamental right to parent is affected, the challenged provisions must be narrowly tailored to meet a compelling state interest.

Both the adoption statutes and the dependency statutes provide for the termination of parental rights and, when viewed broadly, share the same compelling purpose—protecting the safety and welfare of the child. But there is a substantial difference in the nature of the governmental function under each statutory scheme. In a dependency proceeding, the State exercises control over the care and custody of a child following an adjudication of abandonment, abuse, or neglect. RCW 13.34.030(4); RCW 13.34.130. The dependency adjudication allows the court to order reunification efforts and remedial services to address the circumstances that prompted intervention by the State. *In re Dependency of A.W.*, 53 Wn. App. 22, 27, 765 P.2d 307 (1988); *see also In re J.H.*, 117 Wn.2d at 476 ("[T]he paramount goal of child welfare legislation is to reunite the child with his or her legal parents, if reasonably possible.").

Here, in contrast, the adoption proceeding was commenced by one parent's voluntary decision to relinquish her child. There is no indication, and Williams does not argue, that a dependency petition could have been brought in this case. In such situations, the adoption statutes do not provide for State intervention and services. Instead, the act requires an efficient determination of the natural parents' rights and the best interests of the child in order to secure a timely, stable, and permanent placement for the child. *See* RCW 26.33.010; *In re Adoption of Infant Boy Crews*, 60 Wn. App. 202, 210, 803 P.2d 24 (1991), *aff'd*, 118 Wn.2d 561, 825 P.2d 305 (1992); *see also Jackson*, 89 Wn.2d at 949-50. In the case of a nonconsenting parent, the issue of parental fitness is determined in a hearing where the parent receives the full panoply of due process protections, as discussed above.

The constitutional guarantee of equal protection requires that persons similarly situated with respect to the legitimate purposes of the laws receive like treatment. *In re Detention of Dydasco*, 135 Wn.2d 943, 951, 959 P.2d 1111 (1998). " ' "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." ' " *Id.* at 951 (quoting *In re Personal Restraint of Young*, 122 Wn.2d 1, 45, 857 P.2d 989 (1993)). The constitutional guarantee does not require that individuals in circumstances that are different in relevant ways be treated as if their situations were the same or that the Legislature may not respond to such differences. We conclude that when a parent, who is fit, chooses to commence adoption proceedings, the Legislature could rationally determine not to involve the State in the provision of services.

Moreover, with regard to guardianships as an alternative to termination, our courts have consistently held that such placements are only a temporary solution and do not achieve permanence for a child. *In re Dependency of F.S.*, 81 Wn. App. 264, 269, 913 P.2d 844 (1996). Such place-

ments make sense in the dependency context, where the child may need to be temporarily removed from the home. But a guardianship does not adequately substitute for a permanent placement and, in fact, postpones the child's early integration into a stable and permanent home. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 570, 815 P.2d 277 (1991). We conclude that a guardianship would not be an appropriate placement when the purpose of the proceeding is to ensure that the child is placed in a permanent home. We further note that contrary to Williams's assertions, the record does not indicate that an extended family placement was a possibility in this case, as Williams testified that his father was not willing to raise the child and did not want custody.

Termination of Williams's Parental Rights

Williams finally contends that the trial court erred in finding that he was not a fit parent and in terminating his parental rights. RCW 26.33.120 provides that parental rights may be terminated on "a showing by clear, cogent, and convincing evidence . . . that the parent has failed to perform parental duties under circumstances showing a substantial lack of regard for his or her parental obligations." Parental obligations include the following attributes:

"(1) [E]xpress love and affection for the child; (2) express personal concern over the health, education, and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance."

*H.J.P.*, 114 Wn.2d at 531 (quoting *Lybbert*, 75 Wn.2d at 674).

■■ Williams first argues that the trial court erred in finding that his "criminal history does not paint a good picture of his ability and will to turn his life around and provide [the] child with long-term care." He contends that his criminal history is not relevant to an evaluation of his

fitness as a parent because he was not a parent at the time he committed any of his past offenses. He cites for support a Texas case in which the court held that a parent's incarceration prior to the birth of the child did not constitute abandonment. *In re Interest of S.D.H.*, 591 S.W.2d 637, 638 (Tex. Civ. App. 1979). Although our courts have also recognized that incarceration alone does not support the termination of parental rights, the causes and frequency of imprisonment may be considered. *See In re Dependency of J.W.*, 90 Wn. App. 417, 426, 953 P.2d 104 (citing *In re Welfare of Sego*, 82 Wn.2d 736, 740, 513 P.2d 831 (1973)), *review denied*, 136 Wn.2d 1021 (1998). We have also stated that evidence of a parent's past pattern of behavior may be considered even if the parent has no other children. *See In re Adoption of McGee*, 86 Wn. App. 471, 477-78, 937 P.2d 622 (1997) ("The statutory scheme anticipates that a contested termination of parental rights may occur without giving that parent the opportunity to make a fresh start at the child's birth."). Here, the trial court did not rely on the fact of Williams's incarceration, but on his record of committing offenses. In its oral ruling, the court stated that Williams's criminal history indicated he was not experienced with legitimate employment and had not previously demonstrated a long-term commitment to his own rehabilitation. We find that the court did not err in considering this evidence relevant.

Williams contends, however, that the court did not properly consider the testimony describing his ability to care for young children and his parenting skills. Williams testified that he had spent much of his time caring for his nieces and that their care had been a priority for him. Both Thomas and Skinner testified that Williams was loving and attentive with children. Williams had also provided some financial support for his nieces and Skinner's daughter. But the findings of fact and the court's oral ruling indicate that the court did not ignore the testimony concerning Williams's performance in parent-like roles. The court observed that Williams's prior drug use, failure to obtain legitimate employment, and record of criminal activity all

occurred while he was entrusted with the care of minor children. The court also noted that Williams dropped out of his classes and lost his job at the Clallam Bay facility after he had found out about Skinner's pregnancy. And the court indicated that it did not find credible Williams's testimony about his plans to support himself and the child. Nevertheless, Williams contends that the record does not reflect that services were provided to help him turn his life around. As discussed above, we reject the argument that services must be provided to parents in such situations. We find that the trial court properly concluded that the evidence presented at the hearing does not reflect positively on Williams's will or ability to provide long-term care and support for the child.

Williams next contends that the trial court erred in finding that, apart from telling Skinner to call his father and his friend for help, he "took no initiative, and did nothing personally, to directly or indirectly provide for MS. SKINNER during her pregnancy" and had "sent no gift, present, card or money to either MS. SKINNER or her baby" after the child was born. Williams contends that when he offered Skinner the support of his friends and family, she refused his efforts and later cut off contact with him. Thus, he argues, Skinner herself prevented him from providing any support. But the record indicates that Skinner informed Williams of her pregnancy in September 1997 and cut off contact with Williams only shortly before the child was born, over seven months later. There is no evidence that Williams provided emotional or financial support for Skinner during her pregnancy or attempted to take responsibility for the support of the child. Indeed, Skinner testified that she contacted New Hope because she did not believe she had adequate support to raise the child.

▆▆▆ The cases Williams cites for support differ significantly from the instant case in that the parents resisting termination had consistently sought contact with or information about the child at issue. *S.M.W. v. J.M.C.*, 679 So. 2d 256 (Ala. Civ. App. 1996); *In re Reality Rashida J.*, 206

A.D.2d 315, 615 N.Y.S.2d 7 (1994);[4] *In re Adoption of M.J.H.*, 348 Pa. Super. 65, 75-76, 501 A.2d 648 (1985) (concluding, however, that the parent's prison term constituted a continuing incapacity which justified termination); *In Interest of Taylor*, 30 Ill. App. 3d 906, 909-10, 334 N.E.2d 194 (1975). Here, however, although Williams contacted New Hope to find out when the child had been born, he did not attempt to provide for Skinner's or the child's needs through the agency or arrange for the care of the child in the future. As the *M.J.H.* court noted,

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness "in declining to yield to obstacles" his rights may be forfeited.

*M.J.H.*, 348 Pa. Super. at 73-74 (quoting *In re Adoption of McCray*, 460 Pa. 210, 216-17, 331 A.2d 652 (1975)). In *In re Anthony M.*, 195 A.D.2d 315, 600 N.Y.S.2d 37 (1993), also cited by Williams, the court held that an incarcerated parent who had made only two serious efforts to locate his son in two years and had given up "when he encountered the slightest obstacles," had not demonstrated a sincere interest in retaining his parental rights. *Id.* at 316. The court concluded that the parent's "excuse that he was unable to ascertain his son's whereabouts is insufficient to rebut the presumption of abandonment." *Id.* In the instant case, Williams did not make reasonable efforts to demonstrate his willingness to support the child with the resources available to him, and we find that the court did not err in entering the challenged finding.

---

[4]Williams cites to 199 A.D.2d 22, 605 N.Y.S.2d 8 (1993), a decision that was later withdrawn. A substituted decision is published at 615 N.Y.S.2d 7, and is cited above.

Williams has also assigned error to the finding that after he learned of Skinner's pregnancy, he "showed no evidence of any ability or commitment to change himself, he has taken no parenting class, he dropped out of a school program at Clallam Bay Correctional Center, he was fired from his job in the kitchen at Clallam Bay Correctional Center, and he has proposed no realistic plan for caring for the child." Williams has provided no argument regarding why this finding is in error. As discussed above, the record supports the court's findings that Williams did not take responsibility for the child and did not have any concrete plans for his future employment or the child's support. Moreover, Williams himself testified that he had stopped attending classes at the Clallam Bay facility and was fired from his job. He also testified that he was willing to take parenting classes at the Clallam Bay facility, but he did not indicate that he had taken such classes already. We conclude that Williams's challenges to the court's findings and conclusions are without merit, and we affirm the order terminating his parental rights.

AGID, A.C.J., and WEBSTER, J., concur.