# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Adoption of:<br><br>H.L.S.<br><br>A person under the age of 18.<br><br>B.S.<br><br>Appellant,<br><br>v.<br><br>B.H. and S.H.<br><br>Respondents. | No. 46807-7-II<br><br><br>UNPUBLISHED OPINION |

MELNICK, J. — By petition for adoption filed in 2014, the Superior Court terminated B.S.'s parental rights to H.L.S. in a closed proceeding.[1] B.S. appeals the court's order terminating her parental rights and order granting the adoption of H.L.S. She argues that the trial court's findings of fact were not supported by substantial evidence and that the trial court terminated her parental rights without clear, cogent, and convincing evidence to show she was unfit. We affirm.

FACTS

H.L.S. was born in May 2010. His biological mother, B.S., and biological father, H.N., were high school students when they met at a work crew assignment. They had a very brief relationship. B.S. told H.N. she was pregnant about six weeks into her pregnancy. B.S. and H.N.

---

[1] The entire record is sealed in this case. Initials will be used as necessary to identify parties and other individuals.

planned to attend a high school event together about two months into the pregnancy, but on the night of the event they got into a fight. H.N. thought B.S. was going to drink alcohol and it made him angry. They did not see each other again for the length of the pregnancy, except for one brief instance when B.S. dropped off a friend at a party.

At birth, H.L.S. lived with B.S. and her mother. B.S. took care of H.L.S., took him to his wellness appointments, and bought him clothes and supplies. B.S.'s mother provided medical insurance. H.L.S. lived with B.S. for eight weeks. Despite efforts to do so, H.N. did not see H.L.S. for these first couple months of his life.

On July 24, 2010, B.S., her mother, and several friends went on a camping trip to Oregon. H.N. believed B.S. was fleeing the state with H.L.S. and obtained an emergency ex-parte order for custody. He then contacted the police and went with them to the campsite. The police served B.S. with the custody paperwork, took H.L.S. from B.S., and gave him to H.N. Subsequently, B.S.'s mother called H.N. frequently asking to see H.L.S. and H.N. obtained a restraining order against her.

The court scheduled a show cause hearing on the emergency ex-parte order for August 4, 2010. On the morning of August 3, H.N. was asleep on his bed in his apartment with H.L.S. laying by his side. H.N. awoke when someone struck his face. He stood up and "got bashed in the back of the head with a pole a couple of times." 1A Report of Proceedings (RP) at 62. B.S., along with friends D. and H., had broken into H.N.'s apartment by cutting through a screen and climbing inside. B.S. hit H.N. in the back of the head with a metal "pull-down bar" three times. 1A RP at 62. At first, H.N. did not know where H.L.S. was but soon noticed that B.S. was holding him. After H.N. wrestled D. to the ground, B.S. tasered H.N. three times in the neck while she held H.L.S. She and her companions then left the apartment.

H.N. called the police, grabbed the metal bar, and ran after B.S. He caught up with her and B.S. gave H.L.S. back to him. She then jumped in a car and drove away. H.N. first took care of H.L.S. and then went to the hospital where he received staples for his head injury. In September 2010, H.N. obtained a 20 year protection order against B.S.

After the attack, H.L.S. continued to live with H.N. On August 4, 2010, B.S. turned herself in for sentencing on an unrelated residential burglary charge to which she had pleaded guilty a couple months earlier. On November 4, B.S. also entered a guilty plea to burglary in the first degree and assault in the third degree, all related to the incident on August 3, as well as bail jumping. On November 5, B.S. filed a sentencing memorandum requesting that the court not impose legal financial obligations (LFOs) for the convictions because of her inability to earn a substantial income. On November 9, B.S. also pleaded guilty to custodial interference. She went to prison on November 19.

The petitioners, B.H. and S.H., first learned about H.L.S. at the end of 2012. They met H.N. through a mutual connection in their neighborhood who told them H.L.S. "was in need of a stable family." 1A RP at 87. H.N. wanted to find adoptive parents for H.L.S. and B.H. and S.H. were willing to adopt H.L.S. Around January 2013, H.L.S. and H.N. went to live with B.H. and S.H. H.N. stayed with them for about five months. At the time of the adoption proceeding, H.L.S. had lived with B.H. and S.H. for approximately 21 months. H.L.S. calls B.H. and S.H. "Daddy" and "Mommy." 1A RP at 102, 128. He is also attached to their two older children. H.N. voluntarily terminated his parental rights and supports the adoption.

B.H. and S.H. filed a petition for adoption on March 27, 2013. Their attorney visited B.S. in prison in March or April 2013. B.S. was served with the adoption petition on April 10, 2013. The adoption proceeding lasted two days, September 29 and 30, 2014. B.S., set to be released on October 12, 2014, took part in the proceeding by phone.

At the adoption proceeding, B.S. did not testify about the facts of the attack on H.N. but stated it was a "mistake." 1B RP at 223. B.S. stated that while in prison, she received her GED, started attending Alcoholics Anonymous, participated in many self-help courses, and made crafts for H.L.S., such as a quilt and cards. B.S. gave the items to her mother and her mother testified she was going to give them to H.L.S. when she got the chance to see him. They were never delivered to him. B.S. stated she "would like to eventually one day give them to him." 1B RP at 231.

While in prison, B.S. had a job from which she earned approximately $50 a month. B.S.'s mother also sent B.S. $200 a month for "commissary." 1B RP at 167. B.S. testified that she did not ask anyone to put her in contact with H.L.S. because they could not have done it. She did ask friends and family to find pictures of H.L.S. online but nothing indicates she sought contact information for him. B.S. admitted she has not provided any financial support for H.L.S. since her incarceration. B.S. has not seen H.L.S. since August 3, 2010.

The trial court determined that B.S. was unfit and that it was in H.L.S.'s best interest to have B.H. and S.H. adopt him. The trial court entered the following findings of fact and conclusions of law on October 17, 2014:

> 1. [B.S.] was the primary caretaker for the child only during the first eight weeks of his life. The biological father, [H.N.], and [B.H.] and [S.H.] have been the primary caregivers for the past four years of his life.

4

2. [B.S.]'s criminal history amounts to frequent incarcerations from prior criminal activities including possession of stolen property, harassment, residential burglary, assault with deadly weapon and domestic violence, bail jumping and custodial interference.

3. While pending sentencing on the April, 2010 residential burglary, [B.S.] committed a second felony by breaking and entering the home of [H.N.].

4. [B.S.] was on notice by her signed plea agreement for the April, 2010 residential burglary that further criminal acts would increase her sentence from the plea agreement.

5. [B.S.] undertook volitional criminal acts in August, 2010, while knowing that incarceration could result after the previous residential burglary in April, 2010.

6. [B.S.] did not respond to the parentage action filed by [H.N.], . . . , allowing a default order to be entered against her. Instead of responding to the order, she fled with the child to another state. [H.N.] was required to obtain an emergency order for return of the child.

7. During the 18 month pendency of this case, [B.S.] took no efforts to perform parenting functions. [B.S.] had ample opportunity to contact counsel for either side to provide resources for the child, but chose not to do so. The contact information for [B.H.] and [S.H.]'s attorneys were on many documents provided to her.

8. [B.S.] was on record notice of these proceedings at a minimum.

9. [B.S.] failed to appear at the August 4, 2010 hearing on custody of the child after proper notice.

10. [B.S.] demonstrated a lack of concern about the health and well-being of the child by holding him while assaulting [H.N.], thereby subjecting him to the risk of serious injury.

11. In [B.S.]'s sentencing for the August 3, 2010 assault on [H.N.], she pled for an elimination of the LFO's based on her inability to earn a substantial income based upon her young age, lack of education and lack of job skills. Having pled the inability to provide for her material needs before, her argument now that she has such skills lacks credibility.

12. Expert testimony clearly established that the child is bonded with [B.H.] and [S.H.] and their children and extended family.

13. [B.S.] has shown a lack of regard for her parental obligations and has failed to provide any evidence of meeting any of the parental obligations:

| Expression of love and affection for the child | [B.S.] expressed only for the first eight weeks of the child's life |
| --- | --- |
| Expression of personal concern over the health, education and general well-being of the child | [B.S.] may have had concerns, but they were never expressed |

| Duty to supply the necessary food, clothing, and medical care | [B.S.] only provided for the child's first eight weeks of life |
|---|---|
| Duty to provide an adequate domicile | [B.S.] only provided for the child's first eight weeks of life |
| Duty to furnish social and religious guidance. | [B.S.] only provided for the child's first eight weeks of life |

14. [B.H.] and [S.H.] are fit and proper petitioners to adopt [H.L.S.]. They have performed all parenting functions for the child since January, 2013.

Clerk's Papers (CP) at 144-46.

The trial court also concluded, "Clear, cogent and convincing evidence has been presented that [B.S.] is not a fit parent and that the adoption of the child by the petitioners is in his best interest. It would be detrimental to the best interests of the child to remove him from the home of [B.H.] and [S.H.]," and, "The child's best interest will be served by being adopted by [B.H.] and [S.H.]." CP at 147. The court granted the petition to terminate B.S.'s parental rights and granted the order of adoption. B.S. appeals the orders.

ANALYSIS

B.S. argues that the trial court's findings of fact 7, 10, 11, and 13 were not supported by substantial evidence. Furthermore, she contends that clear, cogent, and convincing evidence did not demonstrate that she failed to perform parental duties under circumstances showing a substantial lack of regard for her parental obligations. We disagree.

I. STANDARD OF REVIEW

We review the trial court's challenged findings of fact to determine if they are "'supported by substantial evidence and, if so, whether the findings as a whole sustain the challenged conclusion of law.'" *In re Welfare of Sego*, 82 Wn.2d 736, 743, 513 P.2d 831 (1973) (quoting *Hollingbery v. Dunn*, 68 Wn.2d 75, 82, 411 P.2d 431 (1966)). Substantial evidence is evidence

sufficient to persuade a fair-minded rational person of the truth of the declared premise. *In re Welfare of A.B.*, 181 Wn. App. 45, 59, 323 P.3d 1062 (2014).

In considering whether substantial evidence supports a finding, we must consider the inquiry in light of the relevant burden of persuasion. *Sego*, 82 Wn.2d at 738-39. The question before us is not merely whether there is substantial evidence to support the trial court's ultimate determination of the factual issue but whether there is substantial evidence to support such findings in light of the clear, cogent, and convincing evidence burden. *Sego*, 82 Wn.2d at 739. When the burden of proof is clear, cogent, and convincing evidence, the fact at issue must be shown to be highly probable. *State v. Dobbs*, 180 Wn.2d 1, 11, 320 P.3d 705 (2014).

Deference to the trial court is particularly important in termination proceedings, and we defer to the fact finder on issues of witness credibility and the persuasiveness of the evidence. *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 243, 237 P.3d 944 (2010); *see also In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Unchallenged findings are verities on appeal. *L.N.B.-L.*, 157 Wn. App. at 243.

RCW 26.33.120 governs the termination of parental rights in the context of a petition for adoption. *In re Adoption of McGee*, 86 Wn. App. 471, 473, 937 P.2d 622 (1997). The parent-child relationship may be terminated

> upon a showing by clear, cogent, and convincing evidence that it is in the best interest of the child to terminate the relationship and that the parent has failed to perform parental duties under circumstances showing a substantial lack of regard for his or her parental obligations and is withholding consent to adoption contrary to the best interest of the child.

RCW 26.33.120(1).

The standard does not require balancing of the factors. *McGee*, 86 Wn. App. at 474. The threshold question is whether the parent has failed to perform parental duties under circumstances

showing substantial lack of regard for parental obligations. *McGee*, 86 Wn. App. at 474. The court must resolve this question before it may consider the best interests of child. *McGee*, 86 Wn. App. at 474. In other words, the court must find the parent unfit in order to terminate the parental rights of a non-consenting parent. *McGee*, 86 Wn. App. at 477.

> Parental obligations entail, at a minimum,
>
> (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide adequate domicile; and, (5) the duty to furnish social and religious guidance.

*In re the Matter of H.J.P.*, 114 Wn.2d 522, 531, 789 P.2d 96 (1990) (quoting *In re Adoption of Lybbert*, 75 Wn.2d 671, 674, 453 P.2d 650 (1969)). While a parent's incarceration alone does not support termination of parental rights, the causes and frequency of imprisonment may be considered in determining a parent's fitness or unfitness. *In re Infant Child Skinner*, 97 Wn. App. 108, 120, 982 P.2d 670 (1999).

In determining whether circumstances under which a parent failed to perform parental duties show substantial lack of regard for parental obligations, the court may consider a parent's actions before the child was born. *McGee*, 86 Wn. App. at 479. Courts will not lightly terminate the natural parent-child relationship, and will strictly construe statutes providing for such termination; however, such consideration is subordinate to the moral, intellectual, and material welfare of the child. *Lybbert*, 75 Wn.2d at 674.

II.     FINDINGS OF FACT

B.S. argues that the trial court's findings of fact 7, 10, 11, and 13 are not supported by substantial evidence. We disagree in part.[2]

---

[2] B.H. and S.H. argue that we should not consider any of B.S.'s factual assertions because she does not cite to the record. The record and briefing is sufficiently clear that we will address them.

Finding 7 states, "During the 18 month pendency of this case, [B.S] took no efforts to perform parenting functions. [B.S.] had ample opportunity to contact counsel for either side to provide resources for the child, but chose not to do so. The contact information for [B.H.] and [S.H.]'s attorneys were on many documents provided to her." CP at 145. Finding 13 provides that "[B.S.] has shown a lack of regard for her parental obligations and has failed to provide any evidence of meeting any of the parental obligations." CP at 146. The trial court presented its findings on parental obligations in this chart:

| | |
|---|---|
| Expression of love and affection for the child | [B.S.] expressed only for the first eight weeks of the child's life |
| Expression of personal concern over the health, education and general well-being of the child | [B.S.] may have had concerns, but they were never expressed |
| Duty to supply the necessary food, clothing, and medical care | [B.S.] only provided for the child's first eight weeks of life |
| Duty to provide an adequate domicile | [B.S.] only provided for the child's first eight weeks of life |
| Duty to furnish social and religious guidance. | [B.S.] only provided for the child's first eight weeks of life |

CP at 146.

B.S. does not contest the part of finding 7 that states she had contact information for B.H. and S.H.'s lawyer. Instead, she argues that she did not have resources to provide for H.L.S. and she did what she could do while in prison, which was taking self-improvement classes. However, B.S.'s mother testified that she sent B.S. $200 each moth for commissary and B.S. testified that she earned about $50 each month with a prison job. The evidence shows that B.S. did not directly support H.L.S. during the 4 years she was in prison, nor did she provide money to the people caring for him.

B.S. contends that the crafts she made while in prison evidence her "love and affection for her son." Br. of Appellant at 14. However, although B.S. testified that she asked friends to look

up H.L.S.'s caretakers on the internet for pictures of H.L.S., she did not provide any evidence that she sought out contact information. She testified that she made crafts for H.L.S. and gave them to her mother for delivery. Neither B.S. nor her mother testified they actually tried to get the items to him. B.S. testified she intended to deliver the cards to H.L.S. "eventually one day." 1B RP at 231. We have previously held that "[a] proper regard for parental obligations is reflected in behavior, not intentions." *McGee*, 86 Wn. App. at 480. B.S. only provides evidence of her intentions.

B.S. argues that her May 7, 2013 letter, as well as the classes and workshops she took in prison show her regard for her parental obligations. Although incarceration by itself will not support the termination of parental rights, *Skinner*, 97 Wn. App. at 120, B.S. presented no evidence to show she took any affirmative action to perform parenting functions while imprisoned. Her letter in response to the petition for adoption, dated May 7, states that she would be released soon, she did not know she could have visitation, and that she would be able to provide for H.L.S. The letter expresses the same arguments that she raises on appeal. B.S. testified at the adoption proceeding that she did not ask anyone for visitation because she believed they could not have set it up. She does not dispute that she has not seen H.L.S. since August 3, 2010. B.S. also does not assign error to the trial court's findings that she only provided the necessary food, clothing, and medical care; domicile; and social and religious guidance, during the first eight weeks of H.L.S.'s life. Therefore, we consider these findings verities. *L.N.B.-L.*, 157 Wn. App. at 243.

B.S. presented no evidence that from the time H.L.S. first left her custody to the start of the adoption proceeding, she performed parenting functions. There is no evidence that B.S. provided emotional, physical, or economic support to H.L.S. during the four years of her imprisonment. She provided no evidence that she tried to connect to H.L.S. in any way. Thus, the

trial court's findings that she "took no efforts to perform parenting functions," and that she only expressed love and affection for H.L.S., and only expressed personal concern over H.L.S.'s health, education, and general well-being in the first eight weeks of his life are supported by substantial evidence. CP at 145.

In finding 10, the trial court stated, "[B.S.] demonstrated a lack of concern about the health and well-being of the child by holding him while assaulting [H.N.], thereby subjecting him to the risk of serious injury." CP at 145. B.S. argues that, while her conduct was "inexcusable," the testimony at trial did not show that she put H.L.S at risk. Br. of Appellant at 12-13. This assertion appears to simply be her opinion because she provides no legal support for it. Involving an infant in the events described during trial put him at risk. H.N. and H.L.S. were asleep together on the bed when someone struck H.N. in the face. B.S. then hit H.N. in the back of the head with a metal "pull-down bar" three times. RP at 62. After he wrestled one of her friends to the ground, B.S. tasered H.N. three times in the neck while she held H.L.S. B.S. did not refute these facts. B.S. does not support her argument by any law, and her position is contrary to common sense and reason. The trial court's finding is supported by substantial evidence.

Finding 11 provides, "In [B.S.]'s sentencing for the August 3, 2010 assault on [H.N.], she pled for an elimination of the LFO's based on her inability to earn a substantial income based upon her young age, lack of education and lack of job skills. Having pled the inability to provide for her material needs before, her argument now that she has such skills lacks credibility." CP at 145. B.S. argues that this finding ignores the testimony and exhibits presented at trial showing the improvements she made from August 3, 2010, when she last saw H.L.S., to September 30, 2014, when the trial court terminated her parental rights.

Although the finding uses language of credibility, and we defer to a trial court's credibility determinations, the finding itself does not satisfy the "highly probable" standard. *See Dobbs*, 180 Wn.2d at 11; *L.N.B.-L.*, 157 Wn. App. at 243. At the time of trial, B.S. was scheduled to be released from prison in 12 days, she was 22- not 18-years-old, had obtained her GED, and had participated in numerous self-help classes. While she may in fact struggle to earn a substantial income, holding her to her declaration from four years prior does not equate to substantial evidence given the relevant burden of persuasion, which is clear, cogent, and convincing evidence. This finding is not supported by substantial evidence.

We conclude that substantial evidence supported the trial court's findings of fact 7, 10, and 13, but not finding of fact 11.

III.    CONCLUSIONS OF LAW

B.S. next argues that clear, cogent, and convincing evidence does not support the trial court's conclusion that she failed to perform parental duties under circumstances showing a substantial lack of regard for her parental obligations. Specifically, she asserts that she successfully cared for H.L.S. in the first eight weeks of his life, H.L.S. was forcefully taken from her by his biological father, and her attack on H.L.S.'s father demonstrated her desperation to get her baby back. B.S. asserts that her conduct while in prison shows her desire to reunite with her son and to be a good mother. She also asks us to remember that at the time H.N. filed for custody, she was an 18-year-old without resources, who did not have an attorney, and who had just experienced a negative incident with the police when they took her baby.

B.S.'s contentions only reargue those points addressed above. Her arguments do not contradict the trial court's findings of fact. The trial court found that she only performed parental functions in the first eight weeks of H.L.S.'s life, that she made no effort to perform parenting

functions while imprisoned, and that she committed a felony while knowing the risk of incarceration. The arguments also do not disrupt the trial court's conclusion as to her parental fitness because the conclusion is supported by the findings of fact to which she does not assign error. Unchallenged findings of fact are verities on appeal. *L.N.B.-L.*, 157 Wn. App. at 243.

The threshold question considered by the trial court was whether B.S. had failed to perform parental duties since H.L.S. was 8 weeks old and if that failure showed a substantial lack of regard for her parental obligations. *See McGee*, 86 Wn. App. at 474. The trial court concluded, "Clear, cogent and convincing evidence has been presented that [B.S.] is not a fit parent and that the adoption of the child by the petitioners is in his best interest. It would be detrimental to the best interests of the child to remove him from the home of [B.H.] and [S.H.]." CP at 147.

At a minimum, B.S. needed to provide evidence showing expressed love and affection for H.L.S.; expressed personal concern over his health, education, and general well-being; actions taken to supply necessary food, clothing, and medical care; actions taken to provide adequate domicile; and actions taken to furnish social and religious guidance. *See H.J.P.*, 114 Wn.2d at 531. The trial court's conclusion is supported by the following *uncontested* findings of fact. The trial court found that "[B.S.] was the primary caretaker for the child only during the first eight weeks of his life. The biological father, [H.N.], and [B.H.] and [S.H.] have been the primary caregivers for the past four years of his life." CP at 144. The trial court also found, "[B.S.] did not respond to the parentage action filed by [H.N.], . . . , allowing a default order to be entered against her. Instead of responding to the order, she fled with the child to another state. [H.N.] was required to obtain an emergency order for return of the child." CP at 145. Additionally, the court

found that "[B.S.] failed to appear at the August 4, 2010 hearing on custody of the child after proper notice." CP at 145. These findings demonstrate clear, cogent, and convincing evidence that B.S. was only involved in the first eight weeks of H.L.S.'s life and did not pursue further involvement for the next four years, showing substantial lack of regard for her parental duties.

The trial court also properly considered the causes and frequency of B.S.'s incarceration, *see Skinner*, 97 Wn. App. at 120, as well as her actions before H.L.S was born to determine her fitness to be a parent. *See McGee*, 86 Wn. App. at 479. The trial court entered four relevant *uncontested* findings. First, the court found that "[B.S.]'s criminal history amounts to frequent incarcerations from prior criminal activities including possession of stolen property, harassment, residential burglary, assault with deadly weapon and domestic violence, bail jumping and custodial interference." CP at 144. Second, the court found, "While pending sentencing on the April, 2010 residential burglary, [B.S.] committed a second felony by breaking and entering the home of [H.N.]." CP at 144. Third, the court found that "[B.S.] was on notice by her signed plea agreement for the April, 2010 residential burglary that further criminal acts would increase her sentence from the plea agreement." CP at 144. And fourth, the court found that "[B.S.] undertook volitional criminal acts in August, 2010, while knowing that incarceration could result after the previous residential burglary in April, 2010." CP at 144. These findings establish clear, cogent, and convincing evidence to support the trial court's conclusion that B.S. was unfit.

The trial court properly applied RCW 26.33.120(1). Even if we only rely on the trial court's uncontested findings, clear, cogent, and convincing evidence supports the trial court's conclusion that B.S. failed to perform parental duties under circumstances showing a substantial lack of regard for her parental obligations. B.S. also does not appeal the trial court's conclusion that adoption was in H.L.S.'s best interest.

We affirm the trial court's order terminating B.S.'s parental rights.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Johanson, C.J.

_____
Maxa, J.