In the Matter of the Guardianship and Custody of VERONA JONICE N. and Another, Infants. HARLEM DOWLING CHILDREN'S SERVICES, Respondent; LAVERNE F., Appellant.

First Department, February 27, 1992

APPEARANCES OF COUNSEL

*Dora M. Lassinger* for appellant.

*Philip D. Roach* for respondent.

*Lenore Gittis (Marcia Egger* of counsel), *Law Guardian.*

**OPINION OF THE COURT**

KASSAL, J.

Unlike the vast majority of parental termination cases that wend their way through our courts, the matter before us does not involve State intervention occasioned by drug addiction, alcoholism, physical or sexual abuse, or mental illness. Rather, the record establishes that, in November 1984, respondent mother, Laverne F., came to the attention of the authorities for having left her three children, John, Verona, and Jihan Ebonni, then respectively ages 10, 6, and 21 months, unsupervised for "extended periods of time", while she worked two jobs in a valiant, if losing, struggle to provide them with support and proper housing. In the unusual circumstances presented, we conclude that petitioner has not established permanent neglect on the part of this mother, and the orders of disposition are accordingly reversed, and the matter remanded for a de novo dispositional hearing to determine custody.

Evidence adduced at the fact-finding hearing, held June 17 and 24, 1988, revealed that, at the time that an anonymous caller reported the unattended children to the police, the family resided at the Nevins Hotel in Brooklyn, and respondent was working from 9:00 A.M. to 2:00 P.M. as an assistant in a public school class of emotionally disturbed children, and for Blue Cross/Blue Shield from 4:30 P.M. to 11:00 P.M. Following the police department's emergency removal of the children, respondent voluntarily placed them in foster care. Agency goals to assist her with housing and budgeting, as well as with the education of, and general planning for, the children were established, and it was initially determined that the children would be discharged to respondent when she obtained a three-bedroom apartment.

It is undisputed that respondent worked well with her first agency caseworker, Yvonne Sands, and that she visited the children regularly. By July 1985, respondent had found the required five-room apartment, and the agency progress notes, which were admitted into evidence at the hearing, indicate

that plans were made to discharge the children to her in August 1985, subject to Ms. Sands' approval of the apartment. Before the caseworker had an opportunity to see the apartment, however, she left the agency, and it was not until November 22, 1985, that respondent met her new caseworker. It appears that problems in this relationship developed from the beginning.

For example, despite the fact that an entire year had elapsed since the children's placement, during which time the sole condition for their discharge to respondent was that she obtain a three-bedroom apartment, the new caseworker informed respondent that she would have to attend a parenting skills course, and that it was unrealistic for her to have leased an apartment with a monthly rent of $500 on her salary of $11,000 per year. Difficulties between respondent and the new caseworker increased as she sensed that he was imposing more conditions for the release of her children, but not assisting her in meeting them. For example, respondent was required to obtain a three-bedroom apartment, which would meet the agency's standards of acceptability, but to do so at a rent of less than $500 per month, and when she asked the caseworker to provide a letter which would help her obtain section 8 housing, he failed to do so. Indeed, when asked by the Family Court, during the fact-finding hearing, "Did you do anything to assist her in getting housing?", he replied, "No, I didn't." The new caseworker further conceded that, although he suggested to respondent that she go to public assistance to obtain a supplementary budget, he made no calls on her behalf to any public welfare agency.

As of January 14, 1986, respondent was continuing to visit regularly with her children, and the progress notes for that date establish that the two children "both were excited to see their mother", that they were "looking forward to returning home to their natural mother", and that "the visit went well". The agency notes for the month of February 1986 further reveal that, as respondent became increasingly dissatisfied with the new caseworker, she registered complaints with the Bureau of Child Welfare and various parents' rights groups.

During this period, several aspects of respondent's life began to unravel. Her testimony revealed that she learned that the Board of Education was eliminating the program in which she was employed, that her mother was dying of cancer, and that she herself had serious medical problems. Adding to these difficulties, respondent lost her apartment in March 1986 after

a dispute with the landlord. Following a meeting with the new caseworker on March 25, 1986, respondent discontinued contact with the agency for a period of 11 months. During this time, she was living in the streets, had no funds, was sick, and had suffered the loss of her mother. Explaining at the hearing why she had not sought help from the agency, respondent testified that, "It wouldn't have made any difference. When I was working and was presentable to them, and when I had in my opinion concrete proof that I was trying to get my children back, it wasn't enough for them."

On February 18, 1987, respondent appeared in Family Court in response to a notice, and an impromptu visit with the children was arranged. Thereafter, she resumed visits, and was seeing the children regularly when, on October 14, 1987, the petition seeking termination of her parental rights, on the basis of permanent neglect, was filed.* Following the fact-finding hearing, the Family Court found that respondent had permanently neglected the children.

At the dispositional hearing, held October 11, 1988, adoption caseworker Mark Young testified that respondent was in regular contact with him and visiting the children regularly, that the atmosphere of the visits was positive, and that both respondent and the children displayed affection during the visits. Despite his role as adoption caseworker, Young further testified that he would seriously consider the return of the children to respondent if she had an adequate apartment. At the time of the hearing, respondent was working in an optical store, earning a net salary of $200 per week, and living in an apartment which did not provide adequate room for the girls. Young recommended that the children be adopted by their then foster mother, Estelle McCutcheon. Ms. McCutcheon testified that she wished to adopt the children, but was experiencing some ambivalence because their mother had resumed contact.

At the conclusion of the dispositional hearing, the Family Court held that the best interests of the children required the termination of respondent's parental rights, in order that they could be freed for adoption. We reverse, vacate the finding of permanent neglect, and direct a new dispositional hearing.

Addressing first the court's finding of permanent neglect, we

---

* Petitions were also filed against the natural father, John Edward N., alleging abandonment of the children. These petitions were granted on default, and he is not a party to this appeal.

find that the mother's desire to be with, and to care for, her children is well established, and that permanent neglect cannot fairly be inferred, either as a matter of fact or law, from this record. As to the latter, it is undisputed that respondent's period of noncommunication falls short of the continuous one-year period specified in the statute. (Social Services Law § 384-b, [7] [a]; *see, Matter of Star Leslie W.,* 63 NY2d 136, 146.) Moreover, on this record, petitioner has failed in its burden of establishing by clear and convincing evidence that it exercised "diligent efforts to encourage and strengthen the parental relationship", or that respondent was, during her 11-month absence, financially or physically capable of maintaining contact with, or planning for the future of, her children. (Social Services Law § 384-b [7] [a]; *Matter of Sheila G.,* 61 NY2d 368; *see, Matter of Sean F.,* 155 AD2d 775, 776-777.)

Although some degree of irresponsibility in dealing with her predicament may perhaps be attributed to respondent, and we do not condone her refusal to participate in parenting skills training or undergo psychiatric evaluation, these failings do not constitute permanent neglect or necessitate resort to so drastic a measure as termination of her parental rights. *(See, Matter of William Dwayne B.,* 112 AD2d 703, 704.) It cannot be too strongly emphasized that, to the extent that respondent fell short of ideal standards for parenting, it was largely due to her economic condition and the despair to which she plummeted because of it. Indeed, it is to respondent's credit that, despite enormous difficulties, she has persisted in her attempts to regain the custody of her children. A new hearing to determine whether this will serve the best interests of the children must now be held. *(Matter of Jonathan D.,* 62 AD2d 947, *lv denied* 45 NY2d 706.)

In this context, we observe that many significant changes in circumstances have occurred since the issuance of the orders of disposition. The Family Court's decision was made at a time when it anticipated that the children would remain with, and be adopted by, the foster mother who had cared for them for over two years. Instead, the foster mother ultimately declined to adopt, and the children were sent to their fourth foster family, which was soon to relocate to South Carolina. It would appear that, throughout these difficult years, the sole consistent parental figure these children have had is their natural mother.

Adding to the events since the dispositional hearing is the receipt by the agency of a letter, made available to this court,

which Verona, who is now 13 years old, wrote to "Dear Mom" in November 1991. Verona observes that it was recently her mother's birthday, and states that she misses her and "would really like to live as a family again". She also sends regards to her older brother, John, who was placed with a different agency early in the proceedings, and is currently attending a residential school and visiting his mother on weekends and holidays. John will begin attending college in the fall.

These recent developments underscore the need for a de novo dispositional hearing at which the current status of the mother may be assessed, and the views of the children, now 13 and 9 years of age, may be solicited in camera.

Accordingly, the orders, Family Court, New York County (Sheldon M. Rand, J.), entered November 10, 1988, should be reversed, the petitions dismissed, and the matter remanded for a de novo dispositional hearing to determine custody.

MILONAS, J. P., ASCH and RUBIN, JJ., concur.

Orders of the Family Court, New York County, both entered on November 10, 1988, should be reversed, the petitions dismissed, and the matter remanded for a de novo dispositional hearing to determine custody.