[856 NYS2d 35]

In the Matter of MEDINA AMOR S. and Another, Children Alleged to be Abandoned. OMAR S., Appellant; GRAHAM WINDHAM SERVICES TO FAMILIES, Respondent.

First Department, January 10, 2008

### APPEARANCES OF COUNSEL

*George E. Reed, Jr.*, White Plains, for appellant.

*Carrieri & Carrieri, P.C.*, Mineola (*Ralph R. Carrieri* of counsel), for respondent.

*Law Office of Kenneth M. Tuccillo*, Hastings-on-Hudson (*Kenneth M. Tuccillo* of counsel, *Law Guardian* for Medina Amor S.

*Frederic P. Schneider*, New York City, *Law Guardian* for Omar A.

### OPINION OF THE COURT

SWEENY, J.

The issue in this case is whether petitioner agency proved by clear and convincing evidence that respondent had abandoned his children. For the reasons cited herein, we determine that it did not.

The children in question, Omar and Medina, were placed in petitioner's foster care on June 5, 2000. Their birth mother's drug use was the catalyst for the placement. Her whereabouts are unknown and she was not present at any of the Family Court proceedings.

Respondent is the father of the children. At the time of the children's placement, he was incarcerated in state prison on a murder conviction and will remain incarcerated until at least May 2016. By that time, both children will have passed their 18th birthdays.

In early August 2000, Myrlande Georges, an agency caseworker, took Omar and Medina to visit respondent in prison.

According to Georges, this was the only visit respondent had with the children prior to the agency's filing, on August 17, 2004, of separate petitions seeking the termination of his parental rights. These petitions alleged that respondent had evinced an intent to forgo those rights by reason of his failure to visit or communicate with the children in the six-month period prior to the filing and had therefore abandoned them (Social Services Law § 384-b [4] [b]; [5] [a]).

Georges testified that she contacted respondent through prison channels after the aforementioned visit, but he never responded or contacted her. Some of the letters she sent to him were returned to the agency but she did not produce at the hearing copies of any of the letters she claimed to have sent. Georges testified that respondent provided no financial support for the children, did not maintain contact with them, did not send cards, letters or gifts and that no one contacted the agency on his behalf before the petitions were filed. She maintained that the agency did nothing to prevent or discourage respondent from coming forward, nor were there any other obstacles that might have prevented him from contacting the agency.

On cross-examination, however, Georges testified that in July 2004, before the petitions were filed, she telephonically spoke with April Grigsby, a family service specialist from the Osborne Association who had contacted Georges on respondent's behalf regarding the children. The Osborne Association facilitates family visits for prisoners incarcerated in New York correctional facilities. Georges gave Grigsby the children's foster parents' names and addresses, as well as a letter acknowledging that the agency was in agreement with the Osborne Association's scheduling a visit between the children and respondent in August 2004. Georges stated that the first time she personally met with Grigsby was during that month.

Upon questioning by the court, Georges admitted that she did not send any letters to respondent between February and August 2004 to notify him of any conferences, and did not make any other attempt to contact him during that six-month period.

Kim Benson, the agency caseworker assigned to Medina's case, testified that she was trying to arrange a visit between respondent and the children while he was being held at Rikers Island. However, she made no efforts to communicate directly with respondent. Benson's understanding was that she could only work through social workers or attorneys to arrange the visit, and that she "didn't know I could speak to him directly."

She never asked her supervisor if she could contact respondent directly, either orally or in writing, but stated that she would have had no problem with such direct communication had she known it was permitted.

The court indicated it was "a little shocked" that the caseworker and her supervisor were not familiar with the law requiring them to work with incarcerated parents and expressed concern over the lack of communication with respondent. The court also noted that this failure on the part of the agency could have an impact on the outcome of the hearing.

Ms. Grigsby testified that on May 14, 2004, the Osborne Association received a letter from respondent, who was a participant in a parenting class at Shawangunk Correctional Facility, asking for help in restoring communication and visitation with his children. Respondent learned about the Osborne Association from Grigsby's colleague who ran the parenting class. The letter from respondent stated he knew which agency was dealing with his children, but that he had lost contact with the agency and needed someone to advocate on his behalf. He explained that he had not heard from the agency and could not call it directly because prison policy required the name of an individual to call. Although he had the name and a possible telephone number of the agency, he did not know the name of the caseworker and thus would not be permitted to call. Grigsby wrote back to respondent, and eventually determined that Georges was the children's caseworker.

Grigsby also testified that she left messages for Georges on May 21 and 28, and Georges returned her call on June 2. Georges provided Grigsby with contact information for both children and their foster parents, and they discussed the possibility of a visit with respondent. Grigsby asked for and received a letter from Georges acknowledging that Grigsby would facilitate a visit to the prison, and on August 6, 2004, the visit was held.

During July, Grigsby visited both the children and their respective foster parents and communicated this to respondent. Grigsby was in regular contact with Georges on behalf of respondent during the period from about May 20 to August 6, 2004.

Respondent testified that he was the father of the children and had contact with them through letters, phone calls and trailer visits between 1991 and 2000 when they lived with their mother. In 2000, their mother stopped bringing the children to visit, and his family lost contact with her. He did not know

where she or the children were, and there was no one in her family for him to contact. Respondent claimed that in October 2003, a caseworker from petitioner agency brought the children to visit him. He asked the caseworker for "some paperwork" from the agency about "whatever is going on," but prison rules prohibited his receipt of this material during visits. The caseworker told respondent she was leaving the agency but someone else would contact him.

After learning about the Osborne Association, he wrote to it and received a return letter from Grigsby. She located the children and kept respondent informed of what was happening. He started writing and sending cards to the children in or about May 2004. Grigsby would take the letters to the children and they in turn, sent him letters and cards. Grigsby had records of these letters and cards in her file. There were no phone calls but respondent had a visit with them on August 6, 2004.

According to respondent, no one from petitioner agency ever contacted him concerning the children after May 2004, and he was unable to contact anyone at the agency because he did not have the correct telephone number or the name of a contact person as required by prison rules regarding phone calls.

Family Court found that based on Georges' testimony, there was only one visit between respondent and the children during the requisite six-month period, that being in August 2004. The court further found that visit to be insignificant, that respondent did not send cards, gifts, letters or financial support to the children, and that his testimony concerning his inability to contact the agency was incredible. The court concluded that the agency had proven by clear and convincing evidence that respondent had an intent to forgo his parental rights and obligations by failing to visit and communicate with the children or the agency, although presumptively able to do so.

At the dispositional hearing, both Georges and Benson testified that each foster mother was willing to adopt her foster child, and that each child wished to maintain contact with respondent. Respondent, through counsel, expressed his preference that the children not be freed for adoption. However, counsel stated that respondent was not a viable resource for them at that time, and had not been able to get any family members to come forward. Counsel also expressed respondent's desire to remain in contact with the children.

Family Court found, based on the testimony of the caseworkers, that the agency established by a preponderance of the evi-

dence that it was in each child's best interests that respondent's parental rights be terminated. The court entered a dispositional order for each child accordingly.

Social Services Law § 384-b (4) (b) authorizes termination of parental rights when a parent abandons a child for a period of six months immediately prior to the date the petition is filed. A child is "abandoned" by his parent under this statute

"if such parent evinces an intent to forego his or her parental rights and obligations as manifested by his or her failure to visit the child and communicate with the child or agency, although able to do so and not prevented or discouraged from doing so by the agency. In the absence of evidence to the contrary, such ability to visit and communicate shall be presumed" (§ 384-b [5] [a]).

Social Services Law § 384-b (7), which addresses the "permanently neglected child," provides that

"evidence of insubstantial or infrequent contacts by a parent with his or her child shall not, of itself, be sufficient as a matter of law to preclude a determination that such child is a permanently neglected child. A visit or communication by a parent with the child which is of such character as to overtly demonstrate a lack of affectionate and concerned parenthood shall not be deemed a substantial contact" (§ 384-b [7] [b]).

Clear and convincing evidence is necessary to prove both abandonment (*Matter of Annette B.*, 4 NY3d 509, 514 [2005] and permanent neglect (*see Matter of Jonathan R.M.*, 26 AD3d 205, 206 [2006]).

The incarcerated parent presents "special considerations" that must be considered in determining whether he or she meets the statutory requirements for substantial contact with the child or children (*see* legislative findings, L 1983, ch 911, § 1). The statutory scheme prior to the 1983 amendments presumed that an incarcerated parent was unable to maintain contact with or plan for the future of his or her child (former Social Services Law § 384-b [7] [d] [ii]), thus a finding of permanent neglect by that parent was precluded (*see* Mem of Exec Dept, Council Children and Families, 1983 McKinney's Session Laws of NY, at 2707). At the same time, the consent of such parent was not required before his or her

child was released for adoption (Domestic Relations Law former § 111 [2] [d]; Mem at 2707). The Legislature amended the statutes by removing the status of incarceration as a basis for the termination of parental rights and by recognizing the continuing parental obligations of incarcerated parents to their children (*see* Social Services Law § 384-b [7] [d]; Domestic Relations Law § 111 [2]). The incarcerated parent must cooperate with the child care agency in planning for the child and arranging visits; the agency, in turn, must exercise diligent efforts to arrange for such visits (Social Services Law § 384-b [7] [e] [ii]; [f] [5]).

While an agency bringing a petition for abandonment is not required to use "diligent efforts" to encourage a parent to maintain contact with a child or children when a parent is incarcerated (*Matter of Reality Rashida J.*, 206 AD2d 315, 318 [1994]), there is an issue here as to whether the agency made *any* efforts to assist in communication. Georges admitted that she made no effort to contact respondent in the six-month period prior to the filing of the petitions. Her self-serving testimony that she sent letters to respondent, some of which were returned to the agency, was not supported by any evidence. Moreover, Benson's testimony that she was unaware she could make direct contact with respondent affirms the agency's lack of effort to foster contact between him and the children.

By contrast, although respondent's incarceration limited his ability to contact the agency, his testimony was uncontroverted that state regulations required inmates to have a person's name before being permitted to call an agency. During the six-month period between February and August 2004, he contacted the Osborne Association to seek help in restoring communication and visitation with his children. He utilized the services of an intermediary, Grigsby, to contact the agency, and she was, in fact, in regular contact with agency caseworker Georges on his behalf from at least June or July 2004. Grigsby was instrumental in making arrangements with the agency for the August 6, 2004 visit, and met with both the children and foster parents in July 2004. Although there is a question as to whether respondent did send cards and letters to the children, Grigsby testified that he sent cards to her for delivery to the children and had a notation to that effect in her file. Whether or not respondent could have taken other actions of a similar nature during the relevant six-month period of time, the fact remains that he did make an ef-

fort through Grigsby during that period to resume contact with his children.

Although the court found respondent had abandoned the children, what it really did was take the easier route to termination of parental rights by improperly applying the "permanently neglected child" element of "insubstantial . . . contacts" (Social Services Law § 384-b [7]) rather than the "abandoned" child standard (§ 384-b [5]). These subdivisions are designed to accomplish two different goals.

> "The abandonment section is intended quickly to free for adoption children whose parents have shown no interest in them; the neglect section is designed to free for adoption children whose parents, although technically not guilty of abandonment, have failed to maintain regular contact with their children although granted a longer period of time to attempt to re-establish a family relationship" (*Matter of Ulysses T.*, 87 AD2d 998, 999 [1982], *affd* 66 NY2d 773 [1985]).

Under the circumstances presented, there is no basis for the court's determination that the August 2004 visit constituted an "insignificant contact" even under the permanent neglect standard, or that respondent evinced an intent to forgo his parental rights and obligations (Social Services Law § 384-b [5] [a]; *cf. Matter of Richard X.*, 226 AD2d 762, 765 [1996], *lv denied* 88 NY2d 808 [1996]).

Since petitioner seeks termination of respondent's parental rights so the children could be freed for adoption, the question of abandonment is the threshold issue.

> "Abandonment, as it pertains to adoption, relates to such conduct on the part of a parent as evinces a purposeful ridding of parental obligations and the [forgoing] of parental rights . . . The best interests of the child, as such, is not an ingredient of that conduct and is not involved in this threshold question" (*Matter of Corey L v Martin L*, 45 NY2d 383, 391 [1978]).

Although the court found at the dispositional hearing that it would be in the best interests of the children if they were freed for adoption, that is not the proper standard to be applied in a proceeding seeking to terminate parental rights on the ground of abandonment (*Matter of Female W.*, 47 NY2d 861 [1979]). Simply put, a parent cannot be displaced

"because someone else could do a 'better job' of raising the child," absent extraordinary circumstance such as abandonment, unfitness or persistent neglect (*Matter of Bennett v Jeffreys*, 40 NY2d 543, 548 [1976]). The "best interests" standard applied at the dispositional hearing was, on the basis of this record, present sub rosa throughout all of the agency's case, from findings through disposition. The court found Georges' testimony wholly credible despite the contradictions, particularly her admission that she did not attempt to contact respondent during the six-month statutory period as well as her failure to substantiate her statements that letters sent to respondent were returned to the agency. By the same token, the court found respondent's testimony incredible in all respects. Significantly, the court found that Grigsby made her first contact with Georges "sometime in June 2004," well before the petitions were filed and well within the six-month statutory period. The court discounted respondent's testimony that he sent letters to the children. As noted, it discounted the visit and ignored respondent's efforts with the Osborne Association, efforts which had commenced in May 2004, again long before the petitions were filed. At the dispositional hearing, the agency caseworkers presented evidence as to the suitability of the prospective adoptive parents. The court, invoking the "best interests" standard, found that respondent "apparently is not, at this time, a resource for the children. So . . . there's really no other option." By improperly applying the permanent neglect standard, the court in effect bootstrapped its finding of abandonment to draw an inescapable conclusion that freeing these children for adoption was in their "best interests." While there is a significant tension between respect for the rights of natural parents and the need to protect children, the statutory scheme "should not be so broadly applied that it establishes a preference" (*Corey L*, 45 NY2d at 392).

A termination of parental rights is a drastic event (*Matter of Verona Jonice N.*, 177 AD2d 115, 119 [1992]). On the record before us, the burden necessary to determine those rights has not been met.

Orders, Family Court, Bronx County (Gayle P. Roberts, J.), entered on or about May 3, 2006, which, to the extent appealed from, terminated respondent father's parental rights upon findings of abandonment and committed custody and guardianship of the children to petitioner agency and the Commissioner of Social Services for the purpose of adoption, unanimously re-

versed, on the law and the facts, without costs, the orders vacated, and the petitions dismissed.

Motion seeking to strike reply brief denied.

SAXE, J.P., MARLOW and WILLIAMS, JJ., concur.

Orders, Family Court, Bronx County, entered on or about May 3, 2006, reversed, on the law and the facts, without costs, the orders vacated, and the petitions dismissed. Motion seeking to strike reply brief denied.