# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Adoption of | No. 55360-1-II |
| W.R.H., | |
| A minor child. | UNPUBLISHED OPINION |

GLASGOW, A.C.J.—WRH was born in 2014 to BP, his mother, and AH, his father. AH did not live with BP and WRH, and when BP became unable to care for WRH, the baby began living with relatives. When WRH was about 15 months old, AH was incarcerated.

In 2019, when WRH was five, DW and MW sought to adopt him and terminate AH's and BP's parental rights. BP voluntarily relinquished her rights. AH, who was still incarcerated, did not, although he acknowledged that he primarily wanted to maintain contact with WRH.

After a bench trial, the trial court terminated AH's parental rights, but its written order concluded only that the adoption and termination were in WRH's best interests. The written order did not contain a finding that AH was an unfit parent.

AH appeals the termination order and adoption decree, arguing that the trial court failed to enter an express finding that AH was an unfit parent, it improperly gave WRH's best interests priority over consideration of AH's parental fitness, there was insufficient evidence to support the statutory basis for the termination, and the trial court improperly denied AH's request for a continuance before the bench trial. AH also argues that the trial court should have ordered posttermination contact between him and WRH.

We remand for the trial court to enter a written order expressly addressing whether there is clear, cogent, and convincing evidence that AH was an unfit parent because he failed to perform his parental duties under circumstances showing a substantial lack of regard for his parental obligations based on the existing record. We decline to conclude at this stage that the evidence was insufficient to support termination of AH's parental rights. The trial court did not otherwise err.

FACTS

A.    Background

WRH was born to BP and AH in July 2014. WRH never lived with AH, but they had contact several times per month when WRH was an infant. BP struggled with substance abuse, and when she could no longer care for WRH, he lived with BP's sister and then with her parents.

AH had at least five convictions that resulted in jail or prison time between 2006 and 2016. In 2016, AH was convicted of multiple crimes including reckless driving, obstructing law enforcement, and three counts of illegal possession of a firearm, and he was sentenced to 120 months in prison. He was incarcerated when WRH was approximately 15 months old. He is scheduled to remain incarcerated until approximately 2026, when WRH will be 13 years old.

DW and MW are a married couple living in California with three children. MW's father is the stepfather of WRH's maternal grandmother. DW and MW sought to involuntarily terminate AH's parental rights to WRH and adopt him. BP relinquished her parental rights to WRH in early 2020. After WRH made several visits to DW and MW, the trial court approved placing him with them over AH's objection.

Keith Lawrence performed a home and background study of DW and MW, and he recommended approval of the petition for adoption. Lawrence observed that WRH had adjusted

well to life with DW, MW, and their children. MW, a certified teacher, was home schooling WRH, and had spotted deficits with his reading and math abilities. By Lawrence's second interview, WRH had been living with DW and MW for over two months and was calling them mom and dad. Lawrence also noted that DW and MW were financially capable of raising WRH. WRH's grandparents told Lawrence they intended to remain active in WRH's life in California.

B.    <u>Trial</u>

AH requested a continuance shortly before trial because he wanted to provide Lawrence with phone records from the Department of Corrections documenting his attempts to call WRH since his incarceration. Lawrence informed the trial court that the phone records would only implicate his recommendation regarding an open adoption—he would not reverse course to recommend against the adoption entirely. The trial court denied the continuance because there were other sources of information available regarding the quantity of the calls.

WRH was approximately five years old at the time of trial. At trial, both AH and his counsel focused on asking the court to allow him to have "continuous contact" with WRH. Verbatim Report of Proceedings (VRP) (June 8, 2020) at 28. AH explained that the only reason he was objecting to the adoption was that DW and MW had not agreed to an open adoption and he was "asking the Court to award [him] some sort of visitation." *Id.* at 104-05. Lawrence noted that AH did not object to the adoption during his interview for the placement report, but was "'only concerned about [his] continued contact with [WRH].'" *Id.* at 43.

Lawrence testified about the extent of AH's prior contacts with WRH. Lawrence testified that AH had some in-person contact with WRH during infancy and while BP was in drug treatment, but had only telephonic contact since his incarceration. WRH's grandmother testified that when

3

WRH lived with her, she had limited AH's contact with WRH because the phone calls were "hurting him more than [they were] helping him. It was too confusing." *Id.* at 53. DW and MW also testified that AH had no contact with WRH since WRH relocated to California. DW and MW acknowledged that they did not know whether AH knew how to contact them. AH testified that he did not know a phone number or address to reach WRH in California.

AH testified that after WRH was born, he saw WRH two to four times per month until BP brought the baby with her to an inpatient treatment facility when WRH was eight months old, with more sporadic contact while BP was in treatment. AH testified that since his incarceration, he called WRH approximately every other week, and made plans to have WRH visit him at the prison. AH acknowledged that his phone conversations with WRH were simple and that he made only limited inquiries into WRH's health. The calls stopped roughly a year before the termination trial when WRH's grandparents cut off communication because WRH was struggling with the fact that his father was incarcerated. There was also testimony that the calls ended because DW and MW were planning to try to adopt WRH. AH testified that he sought alternate means of contacting WRH through WRH's aunt and by sending letters, gifts, and photos.

Lawrence testified that since incarceration AH had not provided WRH with shelter or other necessities. He also testified that DW and MW were meeting WRH's needs and that he felt adoption was in WRH's best interests. WRH's grandmother testified that since incarceration AH had not provided WRH any shelter or necessities and that he had not been involved in WRH's medical care, education, extracurricular activities, or social and spiritual needs. DW and MW each testified that WRH was incorporated into their family and that they were providing for his education, medical care, and other needs.

AH testified that he "didn't hesitate to provide" anytime BP sought financial support during WRH's infancy, but admitted that he had not supported WRH since his incarceration. *Id.* at 103. He conceded that, although he was paying child support while incarcerated, the small wages he was paid made the contribution "minute." *Id.* at 107. AH also admitted that since his incarceration he had not had any involvement with WRH's medical care, academics, or social needs, nor had he provided any necessities.

When his counsel asked whether he was objecting to the adoption, AH stated, "No, I am not." *Id.* at 113. He said his "ultimate goal" was "continuous contact with [WRH]." *Id.* And he stated that his only objection to the termination proceedings was because "I would like to maintain communication with my son." *Id.* at 104-05.

C.     Trial Court's Ruling

The trial court gave an oral ruling from the bench at the close of trial. The trial court first recited the statutory standard as: "the burden to show that the termination is proper and right is on the Petitioners, that there needs to be clear, cogent and convincing evidence that there's been a parental failure to perform parental duties and it's in the best interests of the child to terminate the parent-child relationship." *Id.* at 119-20.

During its oral ruling, the trial court noted that AH was likely to be incarcerated until WRH's teenage years. The trial court acknowledged that AH had been present during WRH's infancy until his incarceration when WRH was 15 months old, but since incarceration, "there has really [not been] a lot of contact" between AH and WRH. *Id.* at 121. The trial court expressed that AH "is doing the best that he can do" in light of his incarceration, and acknowledged that AH had made numerous phone calls to WRH, as often as twice per month, while incarcerated. *Id.*

The trial court acknowledged that AH "really wants to have . . . a relationship with his son; and, at the same time, he's just really not able to." *Id.* The trial court found WRH's best interests were "being well met" living with DW and MW. *Id.* The trial court then said,

> [F]or the large part, [WRH's] past challenges, [AH] just was [s]imply not present. I recognize his efforts to make contact and keep contact with his child through the limited means that he has. He seems sincere in his efforts, he seems sincere in his desire to keep that connection.
>
> But, you know, the repeated answer to the question: . . . have you expressed concern about; have you been able to provide, you know, food, clothing, shelter, medical care, dental care. The repeated answer was "No," and that's -- you know, given the circumstances, it's not surprising. Wherein, on the other hand, [DW and MW] the repeated answer to their questions was a repeated "yes," that they have been able to provide those very important physical manifestations of parental duties. And you add to that also just the -- moral upbringing and the love and the concern that appears to be present in their home.

*Id.* at 122-23. Reciting the statutory language nearly verbatim, the trial court concluded, "I'll make a finding that by clear, cogent and convincing evidence, [AH] has failed to perform his parental duties, showing a substantial lack of regard for his parental obligations, and that the best interests of the child, [WRH], is to terminate [AH's] parental rights." *Id.* at 123.

In its written findings, however, the trial court did not find AH unfit, nor did it recite the statutory standard for termination in its written order. Instead, the trial court made several findings regarding AH's incarceration and contact with WRH:

> 2.4 [AH] is currently serving a 120-month criminal sentence. He started his incarceration on or about January of 2016. [AH] has a significant criminal record which includes charges associated with illegal drugs and firearms. At the time of trial, he was incarcerated on a "most serious offense" (strike offense[).]
>
> 2.5 [AH] had limited, sporadic contact with the child from birth to age eight (8) months. He had some additional contact with the child from eight (8) months to age fifteen (15) months. [AH] last had physical contact with the child when the child was fifteen (15) months old. At the time of trial, the child was five (5) years and eleven (11) months old.

> 2.6 [AH] has not financially supported the child. He has not been involved in or played any role in the child's medical care, dental care, mental health care, education, or extracurricular activities. He has not provided the child with social or spiritual guidance. Since the child was fifteen (15) months old he has not provided or contributed to providing the child with food, clothing or shelter. The child never resided with [AH].

CP at 50. The written order also found that the DW and MW "can and have provided the child with food, clothing and shelter," as well as medical care, education, and "social and spiritual guidance." *Id*. The trial court's conclusions of law stated only that "[i]t is in the child's best interests to terminate the parental rights of [AH]." CP at 51. The termination order did not mention open adoption or posttermination contact between AH and WRH. The trial court then issued a decree allowing DW and MW to adopt WRH.

AH now appeals, asking this court to reverse the termination order.

## ANALYSIS

### I. TERMINATION OF PARENTAL RIGHTS UNDER RCW 26.33.120(1)

Washington law permits judicial termination of a parent-child relationship as a precursor to adoption only upon specific findings from the trial court:

> [T]he parent-child relationship of a parent may be terminated upon a showing by clear, cogent, and convincing evidence that *it is in the best interest of the child to terminate the relationship and that the parent has failed to perform parental duties under circumstances showing a substantial lack of regard for his or her parental obligations* and is withholding consent to adoption contrary to the best interest of the child.

RCW 26.33.120(1) (emphasis added). In addition, both the United States Supreme Court and the Washington Supreme Court have held that termination of parental rights requires a showing of parental unfitness. *Santosky v. Kramer*, 455 U.S. 745, 760, 102 S. Ct. 1388, 71 L. Ed. 2d 599

(1982); *In re Interests of H.J.P.*, 114 Wn.2d 522, 527, 789 P.2d 96 (1990). Satisfaction of the statutory requirements establishes parental unfitness. *H.J.P.*, 114 Wn.2d at 531.

Parental obligations in this context include expressing love and affection; expressing personal concern over the child's health, education, and general well-being; supplying food, clothing, and medical care; providing housing; and furnishing social and religious guidance. *Id.* Although incarceration does not alone support the termination of parental rights, "the causes and frequency of imprisonment may be considered." *In re Interests of Infant Child Skinner*, 97 Wn. App. 108, 120, 982 P.2d 670 (1999). A parent's responsibilities are not completely tolled during incarceration—courts may "'inquire whether the parent has utilized those resources at [their] command while in prison in continuing a close relationship with the child.'" *Id.* at 122 (quoting *In re Adoption of M.J.H.*, 348 Pa. Super. 65, 501 A.2d 648, 652 (1985)).

A.      Lack of Express Unfitness Finding

AH argues that his right to due process was violated when the trial court terminated his parental rights without entering a written finding in the termination order that AH was an unfit parent or that the statutory standard for termination was met. DW and MW argue that the trial court's oral findings tracking the language of RCW 26.33.120(1) are sufficient to constitute a finding of parental unfitness.

If a trial court does not make an express finding of parental unfitness before terminating the parent-child relationship, this court may nevertheless imply such a finding "if—but only if— all the facts and circumstances in the record (including but not limited to any boilerplate findings that parrot [statutory language]) clearly demonstrate that the omitted finding was actually intended, and thus made, by the trial court." *In re Welfare of A.B.*, 168 Wn.2d 908, 921, 232 P.3d 1104

(2010). The *A.B.* court concluded that unfitness could not be implied in that case even though the trial court had parroted the statutory standard when concluding the requirements for termination were met. *Id.* at 916-17, 927. The court considered several of the trial court's factual findings that weighed against a conclusion that the father was unfit, including that he had been "'clean and sober'" for several years, was steadily employed, and had "'made almost heroic efforts' to make [his] visits with A.B. meaningful." *Id.* at 922. It is insufficient for an appellate court to hold that the trial court *could* have found a parent unfit; there must be "an actual (as opposed to a fictional) finding of current parental unfitness." *Id.* at 921.[1]

This court has held that an express finding that a father was "'currently unable to parent'" was the equivalent of a finding that the father was currently unfit. *In re Welfare of K.M.M.*, 187 Wn. App. 545, 576, 349 P.3d 929 (2015), *aff'd*, 186 Wn.2d 466, 379 P.3d 75 (2016). In *K.M.M.*, this court implied an unfitness finding when the juvenile court entered 15 findings of fact leading to the conclusion that the father was "'currently unable to parent'" his 11-year-old daughter, *id.* at 576, because the daughter refused to see him, suffered fear when forced to engage with him, and had tied her identity to her foster family to the point where multiple witnesses agreed that reunification with her father was impossible, *id.* at 576-78.

Similarly, in a pre-*A.B.* case, *In re Adoption of Infant McGee*, Division One reversed a trial court order denying adoption and remanded with an order to terminate parental rights and proceed with the adoption when only 3 of the trial court's 61 findings of fact reflected favorably on the father's parental fitness. 86 Wn. App. 471, 475, 937 P.2d 622 (1997). The other findings included

---

[1] Although *A.B.* and *In re Welfare of K.M.M.*, 187 Wn. App. 545, 349 P.3d 929 (2015), *aff'd*, 186 Wn.2d 466 (2016), involved state-initiated terminations under chapter 13.34 RCW, the constitutional due process principle requiring a finding of parental unfitness is the same.

mental, physical, and emotional abuse against the mother, which resulted in a no contact order that the father violated while threatening to kill the mother; drug use; severe untreated psychological problems; no pursuit of visitation; and a refusal to make child support payments. *Id.* at 474-75. Division One found the father's conduct so extreme that "the court's comprehensive findings, when viewed in light of the correct standard, can reasonably lead to only one conclusion: [the father] failed to perform parental duties under circumstances showing a substantial lack of regard for his parental obligations, and he is, therefore, an unfit parent." *Id.* at 480.

In contrast, in *In re Adoption of K.M.T.*, this court reversed termination and adoption orders and remanded for the trial court to expressly address the statutory standard when the trial court made "an express factual finding" that a father had "'failed to exercise his parental rights,'" and a conclusion of law that the father had "'failed to carry out his parental obligations,'" but made no findings or conclusions regarding "circumstances showing a substantial lack of regard" for his parental obligations, or any findings regarding parental unfitness. 195 Wn. App. 548, 557, 561, 381 P.3d 1210 (2016). While the trial court addressed to some extent in its oral ruling a substantial lack of regard for parental obligations, the court found *only* that the father had failed to perform his parental duties, making it difficult to conclude that the finding for substantial lack of regard "'was actually intended, and thus made, by the trial court.'" *Id.* at 563 (quoting *A.B.*, 168 Wn.2d at 921). The trial court acknowledged that the facts presented "a close case," *id.* at 564, and made conflicting statements about the father's efforts to support the child, including, "'[T]here were moments where you wanted to perform your parental duties'" and "'there have been years where you failed to do so,'" *id.* at 563. This court refused to imply a finding of substantial lack of regard for parental obligations, and by extension a finding of parental unfitness. *Id.* at 564. Thus, we

remanded to the trial court to determine whether the existing record supported a substantial lack of regard finding. *Id.* at 566.

In this case, the trial court never made an express written finding of parental unfitness, nor did its written order state that the statutory standards for termination were met. The trial court's few written findings focused on AH's "significant criminal record;" incarceration on a strike offense; "limited, sporadic contact" with WRH, and failure to provide financial support, medical care, education, guidance, and other necessities. CP at 50. The trial court also found that DW and MW were providing for WRH's physical and emotional needs. The written order concluded only that termination was in WRH's best interest.

In its oral ruling, the trial court also did not make an express finding of unfitness. The trial court initially misstated the statutory standard by omitting the second prong of RCW 26.33.120(1)'s test requiring a substantial lack of regard for parental obligations. *See* VRP (June 8, 2020) at 119-120. The trial court then orally found that AH was currently incarcerated and would likely remain incarcerated until WRH was 13 years old. The trial court noted that, although AH did have contact with WRH throughout the first 15 months of WRH's life, there had been very limited contact since WRH was 15 months old. The trial court also acknowledged AH's efforts to remain in contact with WRH from prison and AH's sincerity in wanting to maintain a relationship with his son. The trial court recognized incarceration limited AH. The trial court then compared AH's presence and contributions as a parent with DW and MW's, noting that AH "was [s]imply not present" in WRH's life, even though he "seems sincere in his efforts, he seems sincere in his desire to keep that connection." VRP (June 8, 2020) at 122. The trial court recited the parental

11

duties that AH had not performed, including providing food, clothing, shelter, medical care, and dental care, contrasting him with DW and MW, who were presently meeting those needs.

In concluding its oral ruling, the trial court parroted the statutory language and closed by stating that "I think the best interests were clearly shown here to terminate [AH's] parental rights and allow the adoption of [WRH] to the [W] family." *Id.* at 124.

As noted above, this court can imply or infer the omitted unfitness finding "if—but only if—all the facts and circumstances in the record (including but not limited to any boilerplate findings . . .) clearly demonstrate that the omitted finding was actually intended, and thus made, by the trial court." *A.B.*, 168 Wn.2d at 921. The *A.B.* court therefore made it clear that parroting statutory language does not necessarily amount to an implied finding of unfitness.

Here, the trial court found facts that support the conclusion that circumstances demonstrated AH's inability to meet his parental obligations from prison, including AH's lack of significant contact with WRH throughout his childhood even when he was not incarcerated, his inability to provide for WRH's basic needs, and his failure to participate in WRH's health care, education, or social growth. And unlike in *K.M.T.,* the trial court did not call this a "close case." *See* 195 Wn. App. at 564.

But this case shares similarities with *K.M.T.* where this court remanded for the trial court to enter more detailed findings. In *K.M.T.*, discussion of the father's clear desire to perform parental duties was a factor that prevented this court from implying substantial lack of regard for parental obligations. *See id.* at 563-64. Similar acknowledgments of the parent's desire and efforts to maintain a relationship with the child also weighed against implying an unfitness finding in

*A.B.*, 168 Wn.2d at 922. The trial court here emphasized AH's attempts to maintain contact with WRH even though his efforts were hampered by his incarceration.

Moreover, in other cases where appellate courts have implied a parent's substantial disregard or unfitness, the trial court offered numerous detailed written findings about the parent's present inability to parent the child, or detailed scenarios of extreme abuse coupled with no attempt to visit or contact the child. *See, e.g.*, *McGee*, 86 Wn. App. at 474-75. Here, the trial court offered a total of seven written findings, only three of which touched on AH's ability to parent—the trial court found that AH was serving a lengthy prison sentence, had no physical visitation with WRH since WRH was 15 months old, and had not financially or emotionally supported WRH or provided for his needs since WRH was 15 months old. These findings certainly speak to a failure to meet parental obligations but, like the order in *K.M.T.*, this language does not necessarily address substantial lack of regard for those obligations. And they do not address the evidence that WRH's grandparents took steps to prevent contact between AH and WRH.

The court's written conclusions of law also failed to state the appropriate standard, referring only to "the child's best interests" rather than either unfitness or the prescribed statutory language. CP at 51. We conclude that this sparse written order is insufficient to imply a finding of circumstances demonstrating AH's substantial lack of regard for his parental obligations. And like in *K.M.T.*, neither the written order nor the oral ruling explains how the trial court arrived at a finding of substantial disregard for parental obligations, a finding that must be made in addition to the finding that the parent has failed to meet those obligations. *See* RCW 26.33.120(1). Where the trial court's findings implicate *only* that the father failed to perform his parental duties, it is difficult

to conclude that the finding for substantial lack of regard "'was actually intended, and thus made, by the trial court.'" *K.M.T.*, 195 Wn. App. at 563 (quoting *A.B.*, 168 Wn.2d at 921).

Because we cannot imply a finding of parental unfitness, we follow *K.M.T* and remand for the trial court to enter a written order expressly addressing whether there is clear, cogent, and convincing evidence that AH was an unfit parent because he failed to perform his parental duties under circumstances showing a substantial lack of regard for his parental obligations based on the existing record.

B.      Consideration of WRH's Best Interests Before AH's Parental Unfitness

AH argues that the trial court also violated his due process rights by considering WRH's best interests before evaluating whether AH was an unfit parent. We disagree.

For this argument, AH relies on *A.B.*, which discussed the dependency termination statute under which parental unfitness must be addressed before best interest. 168 Wn.2d at 925. AH also cites a portion of *H.J.P.* addressing a previous adoption statute, former RCW 26.32.056 (1979). 114 Wn.2d at 531. Cases interpreting the former adoption statute explicitly split the analysis into two questions that had to be addressed in order—a jurisdictional question (whether the parent had forfeited their rights to the child) before a dispositional question (whether termination was in the child's best interest). *See id.* (discussing former RCW 26.32.056, noting that the "court must resolve the jurisdictional issue before it can address the best interests of the child").

This strict order of analysis does not appear to have transferred to the current adoption statute. Recently in *In re Welfare of D.E.*, the Supreme Court stated that in RCW 26.33.120 adoptions, "the court looks to whether termination is in the best interests of the child at the outset," in contrast to dependency cases where "the court must first find parental unfitness and that all

statutory termination factors are met prior to examining the best interests of the child." 196 Wn.2d 92, 101, 469 P.3d 1163 (2020). Nevertheless, the plain language of RCW 26.33.120(1) requires a finding of parental unfitness through the satisfaction of the statutory factors, including failure to meet parental obligations and substantial disregard for those obligations, independent of the best interest finding. In other words, a trial court still cannot terminate parental rights under the statute based solely on a best interest determination.

AH's argument improperly relies on the dependency standard discussed in *A.B.*, not the adoption standard, and fails to address more recent statutory language and the Supreme Court's very recent discussion in *D.E.* Here, the trial court may have considered AH's unfitness and WRH's best interests simultaneously; it did not place the best interest determination entirely before its analysis of unfitness.

In light of the plain language of the statute and *D.E.*, we hold that the trial court did not violate AH's due process rights by considering WRH's best interests while simultaneously evaluating AH's unfitness.

## C.   Sufficiency of the Evidence of Substantial Lack of Regard for Parental Obligations

AH also argues that rather than remand for the trial court to revise its written order, this court should reverse and require dismissal because DW and MW did not carry their statutory burden. We disagree.

A party must present "'clear, cogent, and convincing evidence'" to terminate parental rights, "'*i.e.*, the ultimate fact in issue must be shown by evidence to be highly probable.'" *H.J.P.*, 114 Wn.2d at 532 (internal quotation marks omitted) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). This court will not disturb findings of fact that are supported by

substantial evidence in the record that satisfies the highly probable evidence test. *Sego*, 82 Wn.2d at 739.

The parental obligations at issue under the adoption statute include expressing love and affection; expressing personal concern over the child's health, education, and general well-being; supplying food, clothing, and medical care; providing housing; and furnishing social and religious guidance. *H.J.P.*, 114 Wn.2d at 531. As an initial matter, there is no indication, and AH does not argue, that he has additional protections as an incarcerated parent under the circumstances of this case.[2] For example, the Supreme Court has affirmed the termination of parental rights of an incarcerated father who last visited his child a year before the father's arrest; paid "at most, $300 in support money;" and had not expressed love, affection, personal concern, or social or religious guidance to his child for over five years. *In re Interest of Pawling*, 101 Wn.2d 392, 393, 679 P.2d 916 (1984).[3]

In *Skinner*, Division One affirmed a trial court's termination of parental rights under the RCW 26.33.120(1) standard, relying partially on the father's "record of committing offenses." 97

---

[2] Washington law requires additional safeguards to protect incarcerated parents' rights in state-initiated dependency terminations, not adoptions. Dependency proceedings require state intervention and services; adoptions require only "an efficient determination of the natural parents' rights and the best interest of the child in order to secure a timely, stable, and permanent placement for the child." *Skinner*, 97 Wn. App. at 118.

[3] *Pawling* was decided under the prior statutory language that existed pre-1985. But the Supreme Court has recognized that the legislature simply clarified the language without effecting a substantive change when it adopted the current version of the statute. *See H.J.P.*, 114 Wn.2d at 531 (stating that legislature's intent "was to retain the same substantive standard that had been developed under the previous statute and case law" to describe the shift from former RCW 26.32.056 to RCW 26.33.120(1)); *In re Adoption of Lybbert*, 75 Wn.2d 671, 674, 453 P.2d 650 (1969) ("The legislature . . . defined abandonment on the part of the parent to have been established when the circumstances show a 'willful substantial lack of regard for parental obligations.'").

Wn. App. at 120. Although incarceration alone was not enough to support termination, the father's criminal history "indicated he was not experienced with legitimate employment and had not previously demonstrated a long-term commitment to his own rehabilitation." *Id.* Division One held that the trial court did not err by considering evidence of the father's criminal history to be relevant to its termination decision. *Id.* Although the father testified that he wanted to raise his son and had attempted to maintain contact and provide for the child, a guardian ad litem testified that the father "had not made any effort" to support the child emotionally or financially and "had no concrete plans to provide for the care and custody of the child." *Id.* at 113.

Here, AH has a significant criminal record and is currently incarcerated on a strike offense. The trial court also found that AH "last had physical contact with the child when the child was fifteen (15) months old. At the time of trial, the child was five (5) years and eleven (11) months old." CP at 50. Finally, the trial court found that AH had never lived with WRH; had not financially supported WRH; had not provided food or shelter; and had no involvement in WRH's medical care, education, extracurricular activities, or social or spiritual guidance since WRH was 15 months old. The most contact and support that AH provided even when not incarcerated was weekly visits for the first 8 months of WRH's life, and an assertion that he "didn't hesitate to provide" when BP requested money to care for WRH. VRP (June 8, 2020) at 103.

There is testimony in the record that AH made regular attempts to call and seek in-person visitation with WRH after his incarceration and that he pursued alternate channels of contact through WRH's aunt after WRH's grandparents cut off contact, including resorting to letters and gifts when phone calls went unanswered. But these attempts do not meet several of the relevant parental obligations, including providing for the child's basic needs for food, shelter, clothing, and

17

educational support. Washington appellate courts have affirmed substantial lack of regard findings against incarcerated parents who had extensive criminal histories raising doubts about their inability to stay out of jail or prison, who had infrequently or never lived with their child while not incarcerated, who had limited or sporadic contact with the child, and who failed to voluntarily contribute financial or psychological support. *See Pawling*, 101 Wn.2d 393; *Skinner*, 97 Wn. App. 108. Here, AH has an extensive criminal history, having been incarcerated 5 previous times in the 10 years before his most recent incarceration in 2016; he has never lived with WRH, and he has been incarcerated since WRH was 15 months old. He has provided only negligible financial support since his incarceration, and even when he had phone contact with WRH and his grandparents, AH did not provide evidence that he engaged with them regarding WRH's health care or psychological or educational well-being unless the grandparents brought up an issue first.

We therefore decline to conclude that there is insufficient evidence in this record to support a substantial lack of regard for parental obligations or termination of AH's parental rights.[4]

## II. POSTTERMINATION CONTACT ORDER

AH argues to this court that the trial court abused its discretion because it failed to understand that it had discretion to issue an order allowing AH to have contact with WRH postadoption and by failing to issue such an order. In short, AH argues that the trial court had authority as a "court of equity" to issue an order allowing him posttermination contact with WRH,

---

[4] AH's opening brief includes assignments of error to the trial court's findings of fact and conclusions of law 2.5, 2.6, 3.2, and 3.3, and then never mentions those specific findings again, nor does he explain why those findings are unsupported. An assignment of error supported by neither argument nor authority will not be considered on appeal. *State v. Grinier*, 34 Wn. App. 164, 659 P.2d 550 (1983).

should have considered whether posttermination contact was in WRH's best interest, and should have issued an order requiring DW and MW to let him contact WRH. Br. of Appellant at 26. DW and MW argue that the trial court lacks such authority. We agree with DW and MW.[5]

If the plain language of a statute is susceptible to multiple reasonable interpretations, the statute is ambiguous. *State v. Brown*, 194 Wn.2d 972, 976, 454 P.3d 870 (2019). "'In the absence of ambiguity, we will give effect to the plain meaning of the statutory language.'" *Id.* (quoting *In re Marriage of Schneider,* 173 Wn.2d 353, 363, 268 P.3d 215 (2011)).

RCW 26.33.295(2) governs open adoption agreements and states that a trial court "shall not enter a proposed order [regarding communication between a child adoptee and a birth parent] *unless the terms of such order have been approved in writing by the prospective adoptive parents*, [and] any birth parent whose parental rights have not previously been terminated." (Emphasis added.) The plain language of the statute does not allow for an order requiring contact with the birth parent without the consent of the adoptive parents. As a matter of law, the trial court did not err by concluding it had no authority to require an open adoption and posttermination contact between AH and WRH despite the adoptive parents' refusal to consent.

AH argues that because the statute does not expressly address whether the trial court can order ongoing contact as part of the parental termination, equity should address this question. But AH's arguments are directly contrary to the plain language of RCW 26.33.295(2). Because the

---

[5] DW and MW also argue that AH is trying to introduce evidence not considered below by incorporating law review articles and historical background regarding open adoptions. But a party can cite to law review articles and publications as sources without running afoul of the Rules of Appellate Procedure or needing to supplement the record under RAP 9.11.

statute prohibits any open adoption order absent the adoptive parents' consent, we will not use equity to fill in a nonexistent gap in the law.

Additionally, there is no precedent in Washington law for what AH sought from the trial court—an involuntary termination of his parental rights coupled with an order permitting contact with WRH without the adoptive parents' consent. AH cites a case from New York, where a trial court decided that it had authority to issue a postadoption contact order with the child's biological siblings *with the consent of the adoptive parents*. *See In re Adoption of Anthony*, 113 Misc. 2d 26, 28-31, 448 N.Y.S.2d 377 (N.Y. Fam. Ct. 1982). For authority, the court in that case relied on other visitation orders that had also all been issued with the consent of the adoptive parents. *See, e.g.*, *In re Adoption of N.*, 78 Misc. 2d 105, 355 N.Y.S.2d 956 (N.Y. Sur. 1974) (adoptive stepfather consented to visitation of birth father); *In re Adoption of Widrick*, 25 Misc. 2d 1078, 212 N.Y.S.2d 350 (N.Y. Sur. 1960) (same). AH cites to other out-of-state cases as well, but none of them addresses statutory language as plain as ours requiring consent from the adoptive parents before an open adoption can occur.

We are sympathetic to the plight of incarcerated parents, and we understand both the recognized benefits of ongoing contact with birth families and recent trends encouraging mechanisms for incarcerated parents to play a role in their children's lives. But the legislature is the institution most able to address these policy issues through statutory amendments. We cannot rewrite RCW 26.33.295(2), and we decline to require the trial court to order posttermination contact with WRH.

### III. DENIAL OF CONTINUANCE

AH argues that the trial court abused its discretion by denying his motion for a continuance to pursue phone records from the Department of Corrections demonstrating the precise extent of his contact with WRH since incarceration. DW and MW argue that the trial court did not abuse its discretion because the additional records would not have affected Lawrence's recommendation as to termination or the outcome of the trial.

The decision to grant or deny a continuance rests within the sound discretion of the trial court. *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004). A trial court "abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds." *In re Welfare of R.H.*, 176 Wn. App. 419, 424, 309 P.3d 620 (2013). A trial court evaluating a motion for a continuance considers factors "including diligence, due process, the need for an orderly procedure, the possible effect on the trial, and whether prior continuances were granted." *In re Dependency of V.R.R.,* 134 Wn. App. 573, 581, 141 P.3d 85 (2006).

Lawrence conceded that phone records showing contact between AH and WRH would have altered his recommendation from a closed adoption to an open adoption. However, he would not have changed his recommendation to opposing the adoption entirely. DW and MW's trial counsel correctly argued that the trial court had no authority to order an open adoption absent agreement from the adoptive parents. Thus, a change in Lawrence's recommendation to an open adoption would have been irrelevant where the adoptive parents did not consent to an open adoption. The trial court denied the continuance because the record already established that there had been multiple phone contacts between AH and WRH and other sources of information about the phone calls were readily available.

Phone records from DOC would have had no substantive effect on the outcome of the bench trial. Thus, we hold that the trial court did not abuse its discretion by denying AH's request for a continuance to obtain the phone records.

## CONCLUSION

The trial court's written order was inadequate to support the termination of AH's parental rights, and this court cannot imply the necessary parental unfitness finding. We remand for the trial court to expressly address in a written order on this record whether clear, cogent, and convincing evidence establishes that AH was an unfit parent because he failed to perform his parental duties under circumstances showing a substantial lack of regard for his parental obligations based on the existing record. However, we decline to conclude that insufficient evidence exists on this record to support parental unfitness and termination. Thus, we decline to order dismissal on remand.

Additionally, the trial court did not violate AH's due process rights by considering WRH's best interests while evaluating AH's parental fitness, the trial court did not abuse its discretion by refusing to enter a postadoption order allowing AH to have contact with WRH over the adoptive parents' objection, and the trial court did not abuse its discretion by denying AH a continuance.

No. 55360-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, A.C.J.

We concur:

Worswick, J.

Veljacic, J.

23